

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-29-1999

# Merino v IRS

Precedential or Non-Precedential:

Docket 98-7159

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Merino v IRS" (1999). *1999 Decisions.* Paper 293.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/293

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7159

DONALD MERINO; ROSEMARIE MERINO,

        Appellants

v.

COMMISSIONER OF INTERNAL REVENUE

On Appeal from the United States Tax Court
Tax Court Judge: Hon. Howard A. Dawson

Argued: February 10, 1999

Before: BECKER, Chief Judge, McKEE, Ci rcuit Judge, and
LEE,* District Judge

(Opinion Filed: October 29, 1999)

        BERNARD S. MARK, ESQ. (Argued)
        RICHARD S. KESTENBAUM, ESQ.
        Of Counsel
        Kestenbaum & Mark
        40 Cutter Mill Road
        Suite 300
        Great Neck, New York 11021
        Attorneys for Appellants

_____

* The Honorable Donald J. Lee, United States District Court Judge for
the Western District of Pennsylvania, sitting by designation.

          LORETTA C. ARGETT, ESQ.
          Assistant Attorney General
          JONATHAN S. COHEN, ESQ.
          JOAN I. OPPENHEIMER, ESQ.
           (Argued)
          Attorneys, Tax Division
          United States Department of Justice
          Tax Division
          Post Office Box 502
          Washington, D.C. 20044

OPINION OF THE COURT

McKEE, Circuit Judge.

Donald and Rosemarie Merino appeal the ruling of the United States Tax Court sustaining the Commissioner of Internal Revenue's imposition of additional taxes for their negligent underpayment of tax pursuant to IRC SS 6653(a) and (a)(1), and for underpayment of tax attributable to a valuation overstatement pursuant to IRC S 6659.1 The Commissioner's decision was based upon the taxpayers' attempt to claim tax credits and losses purportedly resulting from their 1981 investment in Northeast Resource Recovery Associates ("Northeast") a tax shelter that was a limited partnership involved in the plastics recycling business. Northeast is almost identical to the plastics recycling shelter described in Provizer v. Commissioner of Internal Revenue, 63 T.C.M. (CCH) 2531 (1992), aff'd without pub. op., 996 F.2d 1216 (6th Cir. 1993), cert. denied, 510 U.S. 1163 (1994). In Provizer, the Tax Court upheld the Commissioner's imposition of additional tax and penalties because the tax shelter at issue was a"sham" lacking economic substance and business purpose.

_____

1. The IRC sections at issue here, IRC S 6653 and 6659, were repealed by the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 1001–239, 103 Stat. 2106, S 7721(c)(2), effective for returns due after 1989. However, negligence and substantial valuation misstatements are both components of the accuracy-related penalty found in IRC S 6662. See IRC SS 6662(b)(1), (b)(3) and (e).

For the reasons that follow, we will affirm the Tax Court's ruling here.

I.

Donald Merino is one of many investors who invested in a tax shelter involving the leasing of Sentinel Recyclers and "Plastics Recycling Programs." These programs promoted expanded polyethylene ("EPE") recyclers during 1981 and expanded polystyrene ("EPS") recyclers during 1982. Merino is a professional engineer with a Ph.D. in managerial economics and has spent his entire working life in various capacities of the petrochemical industry. He claims that he is an "acknowledged expert in hydro-carbon and plastics technology." Appellants' Br. at 16.[2] He learned of Northeast through a CPA friend who was considering recommending the tax shelter to clients and who asked Merino to examine it. At the time of the request, Merino's job involved forecasting the price of oil and petroleum-based products such as plastics, and he was actively involved in predicting market trends in the petroleum industry. As a result of the investigation that Merino undertook for his friend, Merino subsequently invested in Northeast himself.

Northeast was created by several simultaneous transactions involving Packaging Industries, Inc. ("PI"), a company that manufactured and sold seven Sentinel EPE recyclers to ECI Corp. for $981,000 each.[3] ECI then resold the EPE recyclers to F & G Group for $1,162,666. The $1,162,666 purchase price consisted of cash in the amount of $79,371.00 and a note in the amount of $1,083,294.00. Ninety percent of the note was nonrecourse, and the remaining ten percent recourse portion was due only after

_____

2. Ironically, Merino appeared as an expert witness for the taxpayers in Provizer v. Commissioner.

3. The Tax Court described the Sentinel EPE recycler as "a simple batch type machine designed to grind expanded polyethylene foam and film into a densified form called `popcorn' that could be further processed to produce resin pellets suitable for some uses in the plastics industry. [It] was incapable of recycling low density polyethylene by itself and had to be used in connection with grinders, extruders and pelletizers." Merino v. Commissioner, T.C. Memo. 1997-385, slip op. at 8 (Aug. 21,1997).

3

the nonrecourse portion was paid. F & G Group then leased the recyclers to Northeast for 12 years (a lease term equal to 150% of the class life of the assets), for monthly rental payments of $110,000. Northeast, in turn, licensed the recyclers to FMEC Corp. for 12 years at a guaranteed minimum royalty of $110,000 per month. Northeast was also to receive additional royalties based on profits realized by FMEC or a sublicensee.[4] Then, FMEC sublicensed the recyclers back to PI.

All of the monthly payments required by and among the various entities offset each other. The payments consisted solely of offsetting bookkeeping entries, and no money ever changed hands. PI sublicensed the recyclers to end-users that would actually use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100% of the recycled scrap in exchange for a payment from FMEC based on the quality and quantity of recycled scrap. In reality, however, the terms of these sublicenses were regularly ignored.

The purchase price of $1,162,666 per recycler that F & G "paid" ECI, and for which Northeast "leased" each recycler from F & G, was used as the basis for each recycler in computing a Northeast investor's investment and energy tax credits. However, the EPE recyclers had a manufacturing cost of only $18,000 each and the fair market value of each EPE recycler did not exceed $50,000 in 1981. Northeast's prospectus informed potential investors of the terms of the simultaneous transactions and stated that each investor would be entitled to claim income tax credits of $84,813 and tax deductions of $40,174 for every $50,000 invested. The prospectus also advised investors of the high degree of business and tax risk associated with an investment in a tax shelter and warned that only people who could afford to lose all of their cash investment and anticipated tax benefits should invest.

_____

4. No profit was involved with the guaranteed minimum royalty. The prospectus stated that only additional royalties would produce a profit, and Northeast was entitled to additional royalties only if FMEC, or a sublicensee made a profit.

4

The prospectus further warned that Northeast had no operating history, that there was no established market for the recyclers, and that there were no assurances that the market prices for virgin resin would remain at their current level or that the recycled plastic would even be marketable as virgin resin. The prospectus informed investors that the general partner who was solely responsible for the management and operation of the business had no significant experience in marketing recycled products and that he had other business commitments requiring a substantial portion of his time. It also advised of the possibility of significant competition from current manufacturers of recycling equipment and of PI's (the recycler's manufacturer) decision not to apply for a patent to protect its trade secrets.

Although the prospectus contained a copy of a favorable tax opinion by an attorney, it warned that investors should rely on their own advisors rather than the tax opinion letter. The opinions of two evaluators, both of whom owned interests in partnerships that leased EPE recyclers, were also contained in the prospectus. One of these evaluators concluded that the price that F & G was to pay for the recyclers was fair and reasonable, although the evaluator did not state the price, and he appeared to be unaware of it. The other evaluator did not appraise the recyclers and only concluded that they would be operational.

II.

When Merino undertook his investigation he obtained a copy of Northeast's prospectus from Northeast's general partner and spent two hours reading it. The general partner suggested that Merino visit PI's Massachusetts plant. Merino did so, but he had to sign a secrecy agreement before PI personnel would allow him to see the operation. Moreover, PI personnel still refused to show Merino PI's records even after he signed the agreement.

While at the plant, Merino watched the operation and talked to PI's president, who told Merino that PI received bulk deliveries by truck instead of by train, and that this resulted in a penalty of four cents per pound. PI's president

5

also told Merino that the plant was in a location which was difficult for trucks to access, especially in the summer. The difficult access resulted in a "location differential" which Merino estimated to be several cents per pound. Merino also learned that PI was not the sole supplier of recycled plastic to any of its customers. In fact, most of PI's customers had between three and five suppliers.

After his inquiry into Northeast, Merino decided to invest $24,000 of his own money through his CPA friend who acted as his nominee. As a result, Merino indirectly owned a 2.5% interest in the partnership. No one, including Merino, ever made a profit in any year from an investment in Northeast.

III.

F & G leased the recyclers to Northeast, and elected to pass the investment and energy tax credits through to Northeast. Consequently, on their 1981 tax return, the Merinos claimed their proportionate share of Northeast's tax credits and losses in the amounts of $22,431 and $19,526 respectively. The credits were based on a claimed value of $1,162,666 per recycler. The Merinos' 1981 income was $109,634, but the tax benefits from Northeast eliminated their 1981 income tax liability in its entirety. Moreover, since the Merinos did not completely use all of the tax credits on their 1981 return, they claimed credit carrybacks to 1978, 1979 and 1980, thereby reducing their tax liabilities for those years.

The Commissioner ruled that Northeast lacked economic substance and business purpose, disallowed the claimed tax benefits, and assessed deficiencies in the Merinos' federal income taxes based upon the Commissioner's conclusion that the limited partnership was nothing more than a tax scheme. The deficiencies for the years in question aggregated to $50,000. In addition, the Commissioner determined that interest on the deficiencies after December 31, 1984, would be calculated at 120

6

percent of the statutory rate under IRC S 6621(c) because the underpayments were tax motivated transactions.5

The taxpayers responded by filing a petition in Tax Court challenging the Commissioner's determination of deficiency. Thereafter, the Commissioner filed an amended answer in which he asserted additions to the tax for 1978, 1979, and 1980 in the respective amounts of $25, $632 and $239 under IRC S 6653(a) because the underpayment of tax was due to taxpayer's negligence; $1,582 for 1981 under IRC S 6653(a)(1) and 50 percent of the interest due on $31,645 under IRC S 6653(a)(2). The Commissioner also asserted an additional tax for 1981 in the amount of $6,645 for a valuation overstatement under IRC S 6659.

Prior to trial, the taxpayers stipulated that the limited partnership transaction lacked economic substance and that they would not therefore, be entitled to any deductions, losses, credits or any other tax benefits. They further stipulated that the underpayments made in their tax return were attributable to tax motivated transactions and that they were therefore subject to the increased interest rates under IRC S 6621(c). Finally, the taxpayers also stipulated that they did not intend to contest that the recycler had a fair market value that was less than $50,000 in 1981 and 1982 and that there was, therefore, a valuation overstatement.6 Accordingly, the only issue at trial was the propriety of the Commissioner's imposition of the penalties7 for negligence and valuation overstatement.

_____

5. The Commissioner's deficiency notice refers to IRC S 6621(d). However, this section was redesignated as S 6621(c) byS 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub.L. 99-514, 100 Stat. 2085, 2744, which was later repealed by S 7721(c) of the Omnibus Budget Reconciliation Act of 1989, Pub.L. 101-239, 103 Stat. 2400. The repeal does not affect this case.

6. Stipulations pursuant to Tax Court Rule 91 have been described as "the bedrock of Tax Court practice and [are] considered largely responsible for the courts' ability to keep current with the thousands of cases docketed each year." Farrell v. Commissioner of Internal Revenue, 136 F.3d 889, 893 (citations and internal quotations omitted).

7. The additional taxes assessed for negligence and valuation overstatement are not taxes which the taxpayers owed but failed to pay. Rather, they are a penalty due in addition to any tax underpayment. Farrell v. Commissioner of Internal Revenue, 136 F.3d at 892.

7

IV.

A.

The Commissioner had the burden of proving Merino's negligence by a preponderance of the evidence because the Commissioner first asserted the additions for negligence and valuation overstatement in an amended answer to the Merinos' petition for review. T. C. Rule 142(a); Vecchio v. Commissioner, 103 T. C. 170, 196 (1994); Achiro v. Commissioner, 77 T. C. 881, 890–91 (1981). At trial, the Commissioner introduced the expert reports of Steven Grossman and Richard S. Lindstrom. Grossman has a Ph.D. in Polymer Science and, at the time of the trial, was a Professor in Plastics Engineering at the University of Massachusetts. His report concluded that the Sentinel EPE recycler did not represent any technology that was new to the industry at the time of its offering. Moreover, his report concluded that comparable and more efficient technology to recycle polyethylene scrap was available elsewhere. For example, he testified that a machine called the"Foremost Densilator" provided equivalent capability, had been available since 1978, and that it sold for about $20,000 in 1981. Grossman's report further concluded that the Sentinel EPE recycler was not viable from the start because it lacked new technology, a continuous source of suitable scrap, and an established market for the recycled pellets. Grossman believed that a reasonable investigation of the recycling industry in 1981 would have shown that the Sentinel EPE recycler had little, if any, commercial value.

Richard Lindstrom, a consultant in plastics and plastics equipment at Arthur D. Little, Inc., from 1956 to 1989, concluded in his report that in 1981 commercial units were available that were equal to the Sentinel EPE recycler in function, product quality and capacity, and that they cost $50,000 or less. Consequently, Lindstrom opined that the value of the Sentinel EPE recycler did not exceed $50,000.

Despite this evidence, Merino insisted that he had not negligently underpaid his tax because the record also demonstrated that he "undertook a high level of due diligence in investigating the bona fides of the investment."

8

Appellants' Br. at 21. This inquiry included, inter alia, spending several hours reviewing the Offering Memorandum, questioning the general partner about the recycler and its manufacturer, visiting the plant in Massachusetts, and investigating whether the EPE recycler was unique because it was capable of recycling low density polyethylene foam. Merino claimed that the evidence of this due diligence supports his contention that he believed that the recycler was a unique product employing novel technology when he first considered investing in Northeast in 1981, and that his investment and the resulting underpayment could not, therefore, have been negligent under the Tax Code.

Merino also argued that, in addition to his due diligence inquiry, he performed an economic analysis of the investment in which he assumed that the price of oil was the critical factor. Merino's investment in Northeast was made in 1981, during the oil crisis. Merino argued that the conventional wisdom when he made his investment was that there was a reasonable expectation that crude oil prices would continue to rise significantly, and he maintained that the price of plastic is directly proportional to the price of crude oil. Therefore, in light of the expected rise in oil prices it would make economic sense for plastics manufacturers to purchase recycled resin pellets rather than new plastic resin, because plastic resin is a petroleum based product. Consequently, Merino asserted that, in 1981, an investment in a plastic recycling operation was reasonable, and should not have invited any penalty based upon negligence or intentional overvaluation.

Merino conceded that his economic analysis proved wrong. Even though the price of crude oil continued to rise in the latter part of 1981 and 1982, the price of low density polyethylene did not. In fact, it went down. However, Merino argued that he can not be found negligent under the Tax Code simply because a reasoned economic analysis of the future value of petroleum-based plastics turned out to be incorrect. Lastly, Merino argued that even though, in 1981, the recycler had a manufacturing cost of $18,000, the fair market value of a Sentinel EPE recycler was $1,162,666, which was the amount F & G "paid" ECI for

9

each recycler. In arriving at that valuation, Merino did not value the recycler by itself. Instead, he asserted that manufacturing cost was not a consideration, and that the fair market value of the Sentinel EPE recycler could not be determined in isolation from the overall recycling system. When viewed in that context, he asserted, the recycler had a fair market value of $1,162,666.

To support the argument that the Sentinel EPE recycler had a value higher than Lindstrom's estimate of $50,000, Merino submitted a report to the Tax Court that had been prepared by Ernest D. Carmagnola, the president of Professional Plastic Associates. Ironically, Carmagnola had originally been retained by the Commissioner in 1984 to evaluate Sentinel EPE recyclers. Based on his information then, Carmagnola estimated that the value of a Sentinel EPE recycler was $250,000. However, Carmagnola subsequently revised his report after receiving additional information. The additional information caused Carmagnola to state in a signed affidavit, dated March 16, 1993, that the fair market value in the recycler in the fall of 1981 was not more than $50,000.

Despite his efforts to support the reasonableness of his valuation of the Sentinel EPE recycler, Merino conceded that he was aware of a number of other commercially available plastic recyclers that he knew ranged in price from $20,000 to $200,000 in 1981. Further, in apparent contradiction of his claim that the Sentinel EPE recycler's ability to recycle low density polyethylene foam made it unique, he stipulated that information published prior to his investment in Northeast indicated that there were several machines capable of recycling low density polyethylene foam that were already on the market in 1981. Merino testified that it was difficult to make money in the plastics recycling business, and Grossman refuted Merino's claim that the price of plastic is directly proportional to the price of crude oil. According to Grossman, a 300% increase in the price of crude oil results in only a 30% to 40% increase in the price of plastics products.

After hearing the evidence, the Tax Court concluded that the Merinos "failed to exercise due care in claiming a large

10

deduction and tax credits with respect to Northeast.. . ."
Tax Ct. Op. at 33-34. The court wrote:

> In view of [Donald Merino's]8 educational background
> and extensive experience in plastics and the nature
> and extent of his investigation, he learned or should
> have learned that the Sentinel EPE recycler was not
> unique and not worth in excess of $50,000, and that
> Northeast lacked economic substance and had no
> potential for profit. [His] self-serving testimony to the
> contrary is not credible, and this Court is not required
> to accept it as true. In contrast, the reports of[the
> Commissioner's] experts Lindstrom and Grossman,
> which reach opposite conclusions from petitioner's, are
> reasonable and persuasive, and the testimony of these
> experts is supported by other portions of the record.

Id. at 33. Consequently, it sustained the Commissioner's
imposition of the negligence penalty.

In support of its conclusions that Merino knew or should
have known about the lack of profit potential, the Tax
Court relied on the risk factors outlined in Northeast's
prospectus, PI's high costs, Merino's knowledge of the
difficulty of making money in plastics recycling, and the
uncooperative attitude of PI employees during his
inspection of PI's plant. The Tax Court based its conclusion
that Merino knew, or should have known, that the recycler
was not worth $1,162,666, on Merino's knowledge that
equivalent recyclers were only worth $20,000 to $200,000,
the lack of patent protection for the EPE recycler, and the
resultant potential for competitors to appropriate any
unique features the EPE recycler may have had. The court
rejected Merino's claim that the recycler was worth
$1,162,667 in the context of the overall system because
that argument required the court to consider the sham
transaction as though it were valid, and value the overall

_____

8. Rosemarie Merino is a party to these proceedings because the Merinos
filed joint returns for the years in question. Apparently, however, she
had little, if anything, to do with the decision to invest in Northeast.
Consequently, the Tax Court negligence analysis focused exclusively on
Donald Merino. However, since the Merinos filed a joint return we refer
to the "taxpayers" here.

11

system accordingly. The court discounted Merino's reliance on the oil crises because it believed the Commissioner's contrary evidence that the price of plastics is not directly proportional to the price of oil. The court gave no weight to the Carmagnola valuation report because it was based upon incomplete information and had subsequently been repudiated by Carmagnola. Finally, the Tax Court noted that the taxpayers' claimed tax benefits equaled 170% of their cash investment and therefore, except for a few weeks at the very beginning, they never had any money in the transaction and invested solely as a tax avoidance measure.

B.

IRC SS 6653(a), and 6653(a)(1), provide for an addition to tax equal to 5% of any underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules and regulations.9 Beginning with tax year 1981, IRC S 6653(a) further provided for an addition to tax equal to 50% of the interest payable on that portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. 10 The Commissioner assessed negligence penalties including interest that Merino purportedly owed for the tax years in question. Merino's counsel has informed this court that, as of the time this appeal was argued, the total amount of the negligence penalty, including interest, had grown to more than $400,000.

IRC S 6653 defines "negligence" as follows: "negligence includes any failure to reasonably comply with the Tax Code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances." Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990). The inquiry into a taxpayer's negligence is highly individualized, and turns on all of the surrounding circumstances including the taxpayer's education, intellect, and sophistication. See David v. Commissioner, 43 F.3d 788, 789 (2d Cir. 1995).

_____

9. S 6653(a)(1) provides for this penalty beginning in tax year 1981.

10. See n.1 supra.

12

We review the Tax Court's conclusion that Merino negligently claimed the credits and losses to determine if it is "clearly erroneous". Goldman v. Commissioner, 39 F.3d 40-2, 406 (2d Cir. 1994). A finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U. S. 364, 395 (1948). If the Tax Court

> account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as a trier of fact, [we] would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer City, 470 U. S. 564, 575 (1985)(citation omitted).

We can not conclude on this record that the Tax Court's decision was clearly erroneous. Donald Merino admitted that, as a result of his experience in the plastics industry, he knew that it was difficult to make money in the plastics recycling business, and testified that he knew equivalent recyclers were available in the marketplace with market values between $20,000 and $200,000. Moreover, he was unable to precisely demonstrate how he arrived at his conclusion that the Sentinel EPE recycler – which had a manufacturing cost of $18,000 – had a tax basis of $1,162,666, other than his unconvincing explanation that it had to be valued as part of the overall recycling system. The Tax Court properly rejected that explanation. It would strain credulity, given all of the testimony before the Tax Court, to hold that Merino was not negligent in underpaying his taxes. Accordingly, we hold that the Tax Court correctly sustained the imposition of the negligence penalty.

C.

IRC S 6659(a) provides, in pertinent part, that "[i]f an individual . . . has an underpayment of the [income] tax . . .

13

which is attributable to a valuation overstatement, then there shall be added to the tax" a graduated penalty.[11] IRC S 6659(c) defined a "valuation overstatement" as occurring whenever "the value of any property, or the adjusted basis of any property, claimed on any return" is overstated by 150 percent or more. The valuation overstatement penalty applies only to the tax year 1981 because that was the year in which the overstatement was made. Here, the claimed valuation exceeded 250 percent of the actual value. Accordingly, the additional tax is 30% of the underpayment. IRC S 6659(b). The Commissioner has calculated the valuation overstatement penalty to be $6,645.

An inquiry into an overstatement penalty must focus upon whether the underpayment is attributable to the overvaluation. A majority of the Courts of Appeals that have addressed this issue have held that "when an underpayment stems from deductions that are disallowed due to a lack of economic substance, the deficiency is attributable to an overstatement of value and is subject to the penalty of S 6659." Zfass v. Commissioner, 118 F.3d 184, 190 (4th Cir. 1997) (citing Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992); Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991); Massengill v. Commissioner, 876 F.2d 616, 619–20 (8th Cir. 1989)). Under this view, whenever a taxpayer knowingly invests in a tax avoidance entity which the taxpayer should know has no economic substance, the valuation overstatement penalty is applied as a matter of course.

Here, the Tax Court found that Northeast was a sham in that it had no economic substance, and no potential for profit. Tax Ct. Op. at 20; 33. It also found that the Sentinel EPE recycler was not worth more than $50,000. Id. at 33. Furthermore, the Merinos stipulated that the actual basis for a Sentinel EPE recycler in 1981 was not more than $50,000. The Merinos also agreed not to contest the existence of a valuation overstatement on their return. Under these circumstances, the Tax Court correctly concluded that the underpayment on the 1981 return was

_____

11. See n. 1 supra.

14

"attributable to" a valuation overstatement. 12 Tax Ct. Op. at 35.

The Merinos argue that where, as here, the Commissioner completely disallows a claimed tax benefit, the tax underpayment cannot be attributable to a valuation overstatement. They base that argument on two cases decided by the Court of Appeals for the Fifth Circuit, viz., Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), and Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990). Todd v. Commissioner, involved husband and wife taxpayers who invested in FoodSource, Inc., which sold interests in refrigerated food containers to investors. The containers were designed to preserve perishable agricultural products during shipment to foreign and domestic markets. Each investor paid a fraction of the alleged purchase price of part or all of a refrigerated unit and signed a promissory note for the balance. FoodSource managed the containers, rented them to food transporters, and regularly reported"profits" each investor purportedly earned.

The Todds purchased two containers on December 8, 1981 and a third on October 14, 1982. They paid FoodSource $52,000 for each container, and signed promissory notes that raised the price of each container to $260,000. The Todds then used the $260,000 figure as the basis of each refrigerated unit, claimed investment tax credits and depreciation deductions for the 1981 and 1982 tax years, and carried unused portions of the investment tax credits back to 1979 and 1980. However, FoodSource did not place the Todds' containers into service until 1983 because of a payment dispute.

The IRS assessed deficiencies and penalties against the Todds and a host of other FoodSource investors who participated in a test case before the Tax Court. In that

_____

12. The Tax Court finding that a tax underpayment is attributable to a valuation overstatement is also subject to the clearly erroneous standard of review. Wolf v. Commissioner, 4 F.3d 709, 715 (9th Cir. 1993). However, the question of whether the valuation overstatement statute applies to a particular taxpayer's situation is a question of law that we subject to plenary review. See Gainer v. Commissioner, 893 F.2d 225, 226 (9th Cir. 1990).

15

case, Noonan v. Commissioner, T.C. Memo. 1986-449, 52 T.C.M. (CCH) 534 (1986), the Tax Court held that the Todds were not entitled to their claimed deductions and credits for 1979 to 1982 because their containers had not been placed in service until 1983. However, other investors like the Hillendahls and the Hendricks, had their containers placed in service during the years for which they claimed tax benefits. The Tax Court nevertheless also ruled against them because the obligations represented by the promissory notes those investors signed were illusory. Accordingly, the Tax Court limited the adjusted basis each taxpayer could claim to the lesser of the $60,000 fair market value of the container or the actual cash payment made by the taxpayer for the unit. Accordingly, investors like the Hillendahls and the Hendricks received substantially smaller deductions and credits than they claimed because of their reduced basis in the refrigerated units. They were also found liable for an addition to tax for a valuation overstatement pursuant to IRC S 6659, and the Tax Court remanded the matter so that the Commissioner could calculate the amount of the deficiencies.

On remand, the Commissioner assessed the IRC S 6659 valuation overstatement penalty against the Todds, who timely petitioned the Tax Court and challenged the penalty. The Tax Court held that since the Todds' claimed benefits were disallowed because the refrigerated units were not placed in service during the tax years in question, their underpayment of tax was not attributable to the valuation overstatement contained in their returns. Thus, the Tax Court overruled the Commissioner's imposition of the overvaluation penalty. Not unexpectedly, the Commissioner appealed.

The Court of Appeals for the Fifth Circuit concluded that the language of IRC S 6659 was ambiguous, and proceeded to examine legislative history. It stated:

> Congress initially enacted S 6659 as part of the Economic Recovery Tax Act of 1981. The House Ways and Means Committee recognized the large number of property valuation disputes clogging the tax collection system, and added the overvaluation penalty to discourage those taxpayers who would inflate the value

16

of property on their tax returns in hopes of "dividing the difference" with the IRS. Unfortunately, none of the formal legislative history provides a method for calculating whether a given tax underpayment is attributable to a valuation overstatement.

862 F.2d at 542. However, the court applied a formula found in the General Explanation of the Economic Recovery Tax Act, a book prepared by the staff on the Joint Committee on Taxation. Id. Under that formula:

> The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability. Thus, the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments) with (2) actual tax liability as reduced by taking into account the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement.

Id. at 542-43. The court offered the following illustration of how the formula would work:

> The determination of the portion of a tax underpayment that is attributable to a valuation overstatement may be illustrated by the following example. Assume that in 1982 an individual files a joint return showing taxable income of $40,000 and tax liability of $9,195. Assume, further, that a $30,000 deduction which was claimed by the taxpayer as the result of a valuation overstatement is adjusted down to $10,000, and that another deduction of $20,000 is disallowed totally for reasons apart from the valuation overstatement. These adjustments result in correct taxable income of $80,000 and correct tax liability of $27,505. Accordingly, the underpayment due to the valuation overstatement is the difference between the tax on $80,000 ($27,505) and the tax on $60,000 ($17,505) (i.e., actual tax liability reduced by taking

17

into account the deductions disallowed because of the
valuation overstatement), or $9,800 [sic].

Id. at 543.

Applying the formula to the Todds' situation, the Court of
Appeals ruled that the Tax Court had properly held that the
Todds were not liable for the overvaluation penalty because
"no portion of the Todds' tax underpayment was
attributable to their valuation overstatements." Id. Under
the formula, the

>Todds' actual tax liability, after adjusting for the failure
>to place the food containers in service before 1983, did
>not differ from their actual tax liability adjusted for the
>valuation overstatements. In other words, where the
>deductions and credits for these refrigeration units were
>inappropriate altogether, the Todds' valuation of the
>property supposedly generating the tax benefits had no
>impact whatsoever on the amount of tax actually owed.

Id. at 543 (emphasis added). Consequently, the Todds were
not liable for the valuation overstatement penalty.

The Merinos argue that the Todd rationale should govern
the adjudication of their case. The Commissioner did not
reduce the basis of the Sentinel EPE recycler from
$1,162,666 to $50,000 and then adjust their tax liability for
the valuation overstatement. Instead, the Commissioner
disallowed the claimed tax benefit entirely. As a result of
the complete disallowance, the Merinos argue that the
overvaluation of the recycler had no effect on the amount of
the tax they owed. In other words, the Merinos argue that
the Joint Committee on Taxation's formula cannot be
applied here because there is no difference between the
actual tax liability resulting from the disallowance and the
actual tax liability as reduced by taking into account the
valuation overstatement. The Merinos argue that the
Commissioner effectively reduced their basis in the recycler
to zero and made the formula unworkable by completely
disallowing the claimed benefit.

However, there are significant differences between the
Todds and the Merinos. First, even though FoodSource was
a tax shelter, it was not lacking in economic substance. See

18

Noonan v. Commissioner, T.C. Memo 1986-449 ("In this case, as contrasted to many of the so-called `tax shelter' cases in which we have determined that investors did not have an actual and honest profit objective, the subject property [i.e., the refrigerated unit] was actually produced and the plan of operation had some commercial potential."). In contrast, the Northeast plastics recycling shelter was a pure, unadulterated, tax avoidance scheme totally devoid of economic substance. Second, the deduction in Todd was disallowed because the refrigerated unit was not placed in service during the taxable years in which the taxpayers claimed the deduction. The claimed benefit was not disallowed because the Todds overvalued the property. Thus, the Todds' overvaluation had nothing to do with the Commissioner's disallowance. The tax benefit claimed by the Merinos was disallowed because the valuation overstatement was an integral part of a tax avoidance scheme. There was no other reason for the disallowance. See Zfass v. Commissioner, 118 F.3d at 190-191 (rejecting taxpayer's Todd-inspired argument where the claimed benefit was disallowed solely because the asset was overvalued and part of a tax scheme).

Nonetheless, the Court of Appeals for the Fifth Circuit has extended Todd to a case where an overvaluation of an asset resulted solely from a taxpayer's interest in a tax avoidance scheme. In Heasley v. Commissioner, 902 F.3d 380 (5th Cir. 1990), the court wrote:

> We see no reason to treat this case any differently than Todd. Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.

Id. at 383. Consequently, the court found that the "IRS erred when it assessed the valuation overstatement penalty and the Tax Court erred as a matter of law by upholding that assessment." Id. In Heasley, unlike Todd, there were no grounds for the disallowance of the claimed benefit other than the overvaluation.

19

However, we do not find the Heasley rationale persuasive here because the court's decision appears to have been driven by understandable sympathy for the Heasleys rather than by a technical analysis of the statute. We do not disagree with the analysis there, however, it has no application here. Mr. and Mrs. Heasley were blue-collar workers who had not graduated from high school. [13] The Heasleys had four children, were concerned about their children's futures, and were aware that they were not knowledgeable enough to invest on their own. Consequently, they relied completely on the advice of an investment advisor who led them into the challenged tax avoidance scheme. Id. at 381. The Court of Appeals concluded that the Heasleys should not be subjected to the additional interest penalty for a tax-motivated transaction because they had a good faith expectation of profit, even though the court accepted the Tax Court's findings that the entity in which the Heasleys invested lacked economic substance and generated only tax deductions and credits and not income. Id. at 385-86. Thus, as the Court of Appeals for the Fourth Circuit subsequently observed, "the Heasleys were indeed scammed out of a considerable sum of money." Zfass, 118 F.3d at 190 n.8. However, the Merinos are not the Heasleys.

We do not believe that Todd and Heasley provide an analytical umbrella for the Merinos because of the significant differences between the Merinos and the Heasleys. Moreover, we do not believe that the complete disallowance of the claimed benefit here precludes the imposition of the valuation overstatement penalty for the simple reason that, given the facts that were either stipulated to or established before the Tax Court, the overvaluation of the property in question here is an essential component of the tax avoidance scheme.

> Where a transaction is not recognized because it lacks economic substance, the resulting underpayment is attributable to the implicit overvaluation. A transaction that lacks economic substance generally reflects an

---

13. Mrs. Heasley did, however, have a GED and she had earned 18 college credits.

20

arrangement in which the basis of the property was misvalued in the context of the transaction. While this interpretation of underpayment "attributable to a valuation overstatement" represents a less common application of section 6659, we believe it comprehends the tax return representations that Congress intended to penalize.

Gilman v. Commissioner, 933 F.2d 143, 152 (2d Cir. 1991). Consequently, where a claimed tax benefit is disallowed because it is an integral part of a transaction lacking economic substance, the imposition of the valuation overstatement penalty is properly imposed, absent considerations that are not present here.

D.

IRC S 6659(e) permits the Commissioner to waive the valuation overstatement penalty "on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." The Commissioner's refusal to waive a S 6659 addition to tax is reviewable for abuse of discretion. Krause v. Commissioner, 99 T.C. 132, 179 (1992).

The Merinos do not argue that there was an abuse of discretion by the Commissioner in failing to waive the penalty. Indeed, they cannot make that argument because they never requested a waiver from the Commissioner. They can not now argue that the Commissioner abused his discretion by refusing a request they never made. See McCoy Enterprises, Inc. v. Commissioner, 58 F.3d 557, 563 (10th Cir. 1995)("It is a well established principle of administrative law that where a party fails to present a claim to the proper administrative agency, courts will decline to consider that party's claim."). Instead, they make the rather novel argument that the Tax Court erred by not requiring the Commissioner to waive the valuation overstatement penalty.

Not surprisingly, the Merinos do not provide any authority for the proposition that the Tax Court can order the Commissioner to affirmatively do something that is

21

within the original discretion of the Commissioner where there is absolutely no record evidence of an abuse of administrative discretion. We believe that it is the taxpayers and their counsel who ought to request any such waiver, not the Tax Court.

V.

For all of the above reasons, we will affirm the decision of the Tax Court. In doing so, however, we note that we are not completely unsympathetic to the Merinos' plight. The Merinos' calculation of their tax liability for the years in question deprived the Commissioner of approximately $50,000 in taxes. The operation of IRC SS 6653 and 6659 have now resulted in a liability that is approaching one-half of one million dollars. Although the taxpayers did not request a waiver of the penalty for overstatement under IRC SS 6659(e), we would hope that the Commissioner would still seriously entertain such a request if the taxpayers make it at this late date. We assume that, if such a request is made the Commissioner will afford it whatever consideration would have been appropriate had it been made in a timely manner.14

As we noted earlier, the Merinos are not the Heasleys. Nevertheless, we can not help but express our concern over the proportionality of the Commissioner's actions here. Nevertheless, the decision of the Tax Court will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

14. Of course, we take no position as to whether the Commisioner's denial of any such request would be viewed as an abuse of discretion. That is not before us.