T.C. Memo. 2009-227

UNITED STATES TAX COURT

ESTATE OF CLOYD F. ANGLE, DECEASED, BONNIE J. ANGLE, SPECIAL
ADMINISTRATOR, AND BONNIE J. ANGLE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13718-01.                    Filed October 5, 2009.

<u>Howard Fisher</u>, <u>Diana Callaghan</u>, <u>David Lee Rice</u>, and <u>John A. Harbin</u>, for petitioners (at trial).

<u>Michael W. Berwind</u> and <u>Steven M. Roth</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Cloyd Angle began 1995 as the owner of 98 shares (or 49 percent) of Cal-Almond, Inc., a prosperous family-owned business.  By the end of 1995, Cal-Almond had sold all of its assets at a considerable gain.  Cloyd reported no gain,

however, on the Angles' 1995 return.[1]  He claimed to have exchanged his shares, via an expensive and convoluted rerouting through several Caribbean trusts and corporations, into two private and (in 1995, at least) nontaxable annuities.  We must determine if his position was justified.

FINDINGS OF FACT

The almond industry is big business in California.  In the mid-1990s, the valleys of central and southern California produced 68 percent (or 245,000 tons) of all the almonds in the world,[2] and Cal-Almond processed approximately 25,000 of those tons.  That made Cal-Almond one of the top four almond processors in the country.

Cloyd had incorporated Cal-Almond in 1979, but by 1990 he had ceded most day-to-day control to his son Tyler.  Tyler Angle had by then concluded that his father was no longer focused on the business.  He told Cloyd that he wanted to take over, and Cloyd agreed.  Tyler started buying shares of Cal-Almond stock and brought in Bob Nunes as Cal-Almond's new CFO.  The two younger men took over the day-to-day responsibilities of running the company.  By the end of 1994, Tyler owned 51 percent of the

---

[1] Cloyd's wife Bonnie is a party only because she and Cloyd filed a joint return, and because she is the special administrator of his estate.

[2] Food and Agriculture Organization of the United Nations, Inventory of Almond Research, Germplasm and References (1997), available at http://www.fao.org/docrep/X5337E/x5337e02.htm.

company and had more than tripled the volume of almonds processed, while Cloyd's participation withered to little more than reviewing the firm's financial reports.

Cloyd wanted out--but only if he could get enough money. Tyler himself offered Cloyd $10 million, which would have been enough if Tyler had shelled it out all at once. But Tyler wanted to stretch the payments over 10 years, and Cloyd refused.

About this same time, a company called Morven Partners began eying Cal-Almond. Morven was a jumbo-sized presence in the nutmeat industry, but had not dipped very far into almonds. Cloyd did not at first tell Tyler about Morven's interest; instead, he confided in Nunes that he was going to "get rid of them" by "throw[ing] out a number that they wouldn't accept." That number was $20 million for the whole business; Morven didn't balk. They even told Cloyd that they would pay the $20 million in a lump sum. That was enough for Cloyd. He told Tyler about the offer and soon convinced Tyler that they both should sell. In October 1994, Morven signed a letter of intent to buy Cal-Almond, which allowed Morven to begin due diligence on the firm's operations.

Cloyd's only concern about selling the company was that he would have to pay taxes on whatever he received.[3] But then he

---

[3] In his notice of deficiency, the Commissioner assumed that Cloyd's basis in his stock was zero and there is nothing in the record to contradict that assumption.

spotted an advertisement for books and tapes on offshore tax planning by a man named Jerome Schneider in SkyMall, a mail-order catalog found in the backs of airplane seats. Schneider didn't have a formal tax-law education--in fact, he had little formal education beyond high school--but he ran seminars in which licensed attorneys would present different ways in which one could theoretically avoid taxes by moving money out of the United States. The strategies promoted at these seminars were unusually aggressive, and Schneider was eventually indicted for conspiracy to defraud the United States and 22 counts of mail and wire fraud. United States v. Schneider, No. CR-02-0403-SI (N.D. Cal., Dec. 19, 2002) (indictment). He eventually pleaded guilty to the conspiracy charge as part of a plea bargain in which he agreed to testify against his former clients for a reduced sentence. United States v. Schneider, No. CR-02-0403-SI (N.D. Cal., Feb. 11, 2004) (plea agreement).

But all that lay in the future. Back in 1994, when Cloyd first happened upon the SkyMall ad, Schneider was still flourishing as a self-proclaimed "offshore guru." Cloyd bit down hard on this lure and bought a summary of Schneider's seminars. After reviewing this "offshore package," Cloyd called Schneider and they met at the end of 1994.

Schneider didn't actually know the legal ins and outs of how to set up a complicated offshore tax shelter--everything he knew

he learned by talking with the lawyers who gave his seminars--so he brought in William Norman, an experienced California tax attorney with whom he had worked before. Norman and he devised a plan they pitched to Cloyd as a way to eliminate all of his taxes on the pending sale of Cal-Almond to Morven. The general idea was to transfer Cloyd's shares in Cal-Almond to a group of offshore companies in exchange for a private annuity, have Cloyd and his wife renounce their American citizenship, and defer recognition of the gain from Cal-Almond's sale to Morven until it could be distributed tax free to an expatriated Cloyd in a country that didn't have an income tax.[4] Cloyd was enthusiastic about the plan, and even convinced his usually more level-headed son to join him to avoid taxes on his share of the sale price, too.

To add an air of legitimacy to Cloyd's transaction, Schneider and Norman needed two things: a company to "find" the offshore group that would buy the Angles' Cal-Almond stock and then flip it to Morven, and a lawyer to represent whatever group was found. To fulfill the latter requirement, Schneider and

---

[4] Congress had noticed this strategy, and in 1996 made unrealized gains immediately taxable for expatriates who gave up their citizenship on or after February 6, 1995, when the expatriation was at least partly for the purpose of avoiding taxes. Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, sec. 511, 110 Stat. 2093 (codified as amended at sec. 877).

Norman decided to bring in one of Norman's law-school buddies--Lawrence Heller. Heller was an international-tax attorney in Los Angeles who had practice working with private annuities. He was also a partner in Whitman Breed Abbott and Morgan, a full-service law firm which could--and later did--provide assistance with the Cal-Almond sale to Morven. From Schneider and Norman's perspective, it was a perfect fit--especially because they knew that Heller's close relationship with Norman would help nudge him to go along with whatever annuity terms Cloyd required.

With Heller in place, Schneider and Norman next set to finding a company to "find" the offshore group that Heller would be representing. Schneider owned a brokerage firm, AmeriNational, which was on the verge of insolvency and needed cash. At Norman's suggestion, they decided to use AmeriNational to play the role of finder, with Heller and Whitman Breed acting as AmeriNational's attorneys. Heller drew up an engagement letter addressed to AmeriNational's president, Peter Provence, discussing this representation. According to Provence --and we specifically find him credible on this point--not only did that letter never make it to his desk, but he himself never even heard of Heller or Whitman Breed before preparing to testify in this case. Provence also testified credibly that AmeriNational never paid the $25,000 retainer that the letter claimed it had, claiming that such a large amount "would have put

* * * [AmeriNational] in a net capital violation and it would have stopped--shut down the firm that day."

Provence did sign a few documents which were connected with the Angles' transaction, but he did so without reading them because Schneider told Provence to just sign whatever documents Heller put in front of him. We therefore find that Schneider controlled everything to do with the Angles' deal and used Provence only to lend an air of legitimacy to AmeriNational's involvement--which was ultimately just to act as a clearinghouse through which the various attorneys and corporations billed their services. As charges were incurred for the Angles' transaction, invoices were sent to AmeriNational or to Schneider's other corporation, Wilshire Trust. Those invoices were then forwarded to Cal-Almond for Cloyd's approval. Once Cloyd approved the payment, he sent money to Wilshire Trust for disbursement; there is no evidence that AmeriNational itself ever paid any of the invoices it received.

We therefore find that AmeriNational never provided any services for the Angles other than receiving and forwarding invoices, despite a paper trail that features a Transaction Facilitation Agreement, which Heller also drafted, between AmeriNational and the Angles. This Agreement promised AmeriNational would advise Cloyd and Tyler on how to dispose of their Cal-Almond stock and introduce them to financial

intermediaries who could assist in the disposal.  Provence credibly testified, however, that AmeriNational didn't have anybody at the firm experienced in investment banking, nor did AmeriNational provide any of the supposed services outlined in the Agreement.  Even if AmeriNational had the expertise, it would have had no time to perform--the Agreement was drafted on May 4, 1995, just days before Cloyd signed a Stock Purchase Agreement to sell his Cal-Almond stock.  The Transaction Facilitation Agreement was backdated with an effective date of January 13, 1995, to make it appear as if AmeriNational had been involved from the beginning, but we find this all to be just another part of Schneider's fictitious paper trail, laid down to make the deal look legitmate.

Meanwhile, in January 1995, Cloyd and Bonnie began working on another part of the Schneider/Norman/Heller plan--expatriation to a Caribbean country with low or no income tax.[5]  Their trip to the Caribbean also enabled Cloyd to visit the British Virgin Islands along with Schneider, Norman, and Heller.  The four met there with a representative of TrustNet Group, a BVI trust company, who provided them with a list of approximately 30 "off-

---

[5] The expatriation part of the plan didn't work out.  Cloyd and Bonnie became citizens of St. Kitts and Nevis on January 18, 1995, but they didn't have a consul prepare Certificates of Loss of Nationality of the United States until March 14, 1996, and those certificates weren't approved until August 8, 1996.  The Angles conceded before trial that for income-tax purposes they were U.S. residents throughout 1995.

the-shelf" corporations.[6] Cloyd looked over the list and decided that he would buy Molseberry, Ltd. (Molseberry), and Padang Securities, Ltd. (Padang), as the corporations to which he would sell his Cal-Almond stock, not because they had any assets or because he'd actually performed due diligence on them--which he hadn't--but because he liked the names.

In April 1995, the final offshore structure was set.[7] Molseberry issued all of its stock to Padang, which then issued its stock to three different entities: Investment Capital Corporations (ICC), a Turks and Caicos-based company created solely for this transaction by The Chartered Trust Co., Ltd.; ATC Trustees, Ltd. (ATC), a BVI-based affiliate of a Dutch company, ATC Group; and Padang Securities Limited Purpose Trust (Padang Trust), which was created as a BVI trust sometime before April 1995, and whose BVI trustee was Codan Trustees, Ltd. (Codan). ICC and ATC were each paid $10,000 to take 45 percent of Padang's stock; and Codan was promised an annual $3,000 retainer to take 10 percent of Padang's stock as trustee of Padang Trust, and to provide trustee and director services. HWR Trustees, a BVI-based

---

[6] Such corporations are companies that have been incorporated but not yet used for any business purpose.

[7] Tyler set up an almost identical structure to that of his father. The only difference is that he used a corporation named Bergston, Ltd., in place of Molseberry; Padang owned both of these corporations, so the entire structure beyond Padang is the same.

company, was named the enforcer for Padang Trust, which meant it had the power to hire and fire the trustee. We specifically find that grafting these entities to each other was intended by all involved to camouflage Cloyd and Tyler from the trust that was to hold their Cal-Almond money. But, as we shall see, Cloyd remained in control.

When all this artificial foliage was finally arranged, it looked like this:



On May 9, 1995, Molseberry and Cloyd entered into the Stock Purchase Agreement. Cloyd agreed to "sell" his 98 shares of Cal-Almond stock in exchange for two unsecured private annuities, with the payment schedule to be determined later. This Agreement was "negotiated"--at least on paper, though we find that there was nothing more than an appearance of negotiation--between Norman and Heller. The closing, at which Cloyd was to turn over his shares of stock, was scheduled to take place in the BVI on May 12, 1995. Cloyd, however, did not deliver the stock to Molseberry until October 25, 1995. Molseberry did not seek any damages for this significant delay in performance.

Sometime between May 9 and October 25, 1995, Tyler met with Morven and informed it of the upcoming change in Cal-Almond's ownership. Tyler explained (and we specifically find) that this change was being made only so that Cloyd and Tyler could manage the tax consequences of the sale. There was never any indication that Morven would actually be dealing with anyone new, and Tyler remained Morven's point of contact throughout the sale process. As long as the new shareholders were authorized to sell Cal-Almond's assets--and willing to do so--Morven really didn't care. It continued its due diligence of Cal-Almond as if nothing had changed.

No other significant events occurred until October 25, 1995, when Molseberry finally received the Cal-Almond shares from Cloyd

and supposedly executed two private annuities in Cloyd's favor. The first of these annuities had an effective date of October 25, 1995, and an annuity start date of March 1, 1996; the second had an effective date of January 1, 1996, and an annuity start date of July 1, 1997. The exact payout schedule was not included in the record for either of the annuities, but the bulk of the payout was to be paid in the first five years with token payments continuing after that for the duration of Cloyd's life expectancy according to the IRS charts.[8]

On October 26, 2005, Padang guaranteed Molseberry's annuity commitments and the Padang shareholders agreed to restrictions on their ability to sell Padang stock. There is nothing in the record, however, to suggest that Padang actually owned any assets--other than Molseberry itself--to back this guaranty. It's impossible even to conclude that Padang's "owners" were in any way investing for their own account. Padang's articles of association forbade it from taking a dividend out of Molseberry, and the shareholders' agreement forbade them from selling or borrowing against the shares. The only realistic source of profit for them was to charge fees--and the record shows that

---

[8] To compute the required minimum annual distribution of an annuity, one divides the annuitant's account balance by the applicable distribution period (or life expectancy). The IRS publishes tables of life expectancies which private parties can use. See Internal Revenue Service, Publication 590, Individual Retirement Arrangements (IRAs).

Cal-Almond (on Cloyd's approval) continued to pay hefty fees for months after Cal-Almond's stock was owned by Molseberry. Even as late as 1998, one of Padang's paper shareholders, ATC, complained to one of Cloyd's Canadian lawyers that it felt itself entitled to continuing annual payments for its part in the deal.

We therefore find that Cloyd effectively controlled both Molseberry and Padang, and therefore controlled how and when the stock would be sold. The restrictions to which Padang's supposed owners agreed were really just more leaves along the paper trail which Schneider, Norman, and Heller were still blazing.

Back in the real world, Morven signed an Asset Purchase Agreement in the first week of November 1995 in which Cal-Almond sold its assets to Morven and received $20 million cash in exchange. After the sale, Cal-Almond began a process of liquidation and opened up a new account called the Cal-Almond Shareholders Trust, into which it placed the cash from Morven. The Shareholders Trust account was managed by the Cal-Almond board of directors, which meant that it was actually managed by Cloyd and Tyler; none of the Caribbean paper shareholders had any representation in Cal-Almond at any time.

Cloyd and Tyler kept all of the proceeds in the Shareholders Trust for approximately six months while Molseberry attempted to set up Molseberry Limited Investment Trust (Molseberry Trust), the trust which was--at least on paper--to administer Cloyd's

private annuity.  Norman and Heller wanted Molseberry Trust in

place before any cash was transferred out of Cal-Almond so that

the money would be going into a trust instead of a corporation.

However, Cloyd grew impatient and ordered the money to be wired

to Molseberry in May 1996 before Molseberry Trust was formed.

The record is unclear on what happened to the money after it

was wired to Molseberry.  Cloyd and Bonnie became Canadian

residents in late 1995, and at least $3.2 million was transferred

at Cloyd's direction to Canadian Agriculture--a Cayman Islands

corporation through which Cloyd hoped to distribute his money

into Canada tax free.  (At the time, Canada had a law under whose

terms new immigrants could receive foreign trust income tax free

for their first five years of residence, as long as they didn't

retain control of the trust.  Cloyd planned to use a five-year

trust through Canadian Agriculture and earn income on the $3.2

million tax free--he didn't want to avoid taxes in the United

States only to then have to pay them to Canada.)

The Commissioner sent a notice of deficiency to Cloyd and

Bonnie for their 1995 tax year.  The notice included the full

amount of the Cal-Almond sale in their taxable income, and showed

a tax due of more than $2 million plus a 20-percent penalty under

section 6662 for substantially understating their income tax.[9]

---

[9] Unless otherwise noted, all section references are to the
Internal Revenue Code in effect for the years at issue and all
(continued...)

Cloyd and Bonnie were residing in British Columbia, Canada, when they filed a timely petition to contest the notice.[10]  Cloyd died before trial began, and Bonnie was made the special administrator of his estate.  Trial was finally held in Los Angeles.

OPINION

## I.   Taxability of the Cal-Almond Asset Sale

The Angles argue that all these maneuverings made the gain Cloyd otherwise would have realized and recognized in 1995 disappear.  We disagree.

The first reason this magic fails is that we specifically find there was no private annuity in existence in 1995.  The annuity agreements weren't actually signed on October 25, 1995 at the meeting in the BVI.  Cloyd didn't attend that meeting--he sent Norman as his representative.  Yet all the parties agree that it is Cloyd's signature on the documents, not Norman's.  From this, we find that the documents weren't signed until after October 25.  And since nobody seems to have seen a signed copy of

---

[9](...continued)
Rule references are to the Tax Court Rules of Practice and Procedure.

The notice of deficiency incorrectly charged a 20-percent penalty twice--once for substantial understatement under section 6662(b)(2), and again for negligence under section 6662(b)(1). Section 6662 allows only a single 20-percent penalty, as the Commissioner has since conceded.

[10] Barring a stipulation to the contrary, that means any appeal from this decision will be to the District of Columbia Circuit.  Sec. 7482(b)(1) and (2).

the annuity documents until pretrial preparation, we find it more likely then not that they weren't signed until long after 1995.

Even if the agreements had actually been signed in 1995, however, we would still find that the private annuity didn't really exist. Molseberry didn't receive any funding with which to pay the annuities until July 1996--four months *after* the first annuity payments were due. There also weren't any checks or statements that might have led us at least to infer the annuities' existence. We therefore find by a preponderance of the evidence that Cloyd had not even one annuity from Molseberry in 1995.

Another reason this sleight-of-hand fails is that Cloyd had complete control over Molseberry. Each of the three nominal Padang shareholders--ICC, ATC, and Codan--required the assurance that it would receive retainer fees before it agreed to subscribe to shares of Padang stock. In Codan's case, the retainer was annual and was subject to review and adjustment "in line with the duties performed." Each company's retainer fee--as well as the ongoing maintenance fees for both Padang and Molseberry--was paid by Cal-Almond through Schneider's company, Wilshire Trust, after personal review and approval by Cloyd. Cloyd completely controlled the Padang shareholders, none of which had any purpose apart from owning Padang shares. This means those shareholders were nothing more than nominees for Cloyd. Cloyd himself was the

indirect owner, and controlled Molseberry--a conclusion which is also supported by the fact that Cloyd handpicked each of the companies with the idea that they would ultimately do what he wanted them to do with the money. The evidence even showed that Cloyd at first thought he would use a company called Trust Net to manage Padang--until that company looked like it would act independently, whereupon Cloyd cut it off and began looking for more pliable companies to receive his money.

What made Cloyd, his lawyers, and Schneider think they could make all of this work was a pair of Ninth Circuit cases: Stern v. Commissioner, 747 F.2d 555 (9th Cir. 1984), revg. and remanding 77 T.C. 614 (1981), and Syufy v. United States, 818 F.2d 1457 (9th Cir. 1987). In Stern, the taxpayers transferred appreciated stock into two foreign trusts in exchange for private annuities. Syufy involved a similar scenario but with a single foreign trust and a single annuity. In both cases, the trusts had a foreign trustee which the court found to be completely independent from the respective taxpayers. The court also found in both cases that the taxpayers did not retain sufficient control over the property in the trust to warrant treating the transaction as a transfer in trust subject to a retained income interest, especially when the purpose of the transactions was to minimize estate taxes and not to avoid income taxes. As a

result, the Ninth Circuit held the transactions in both <u>Stern</u> and <u>Syufy</u> to be transfers in exchange for annuities.

In drawing on these two cases, however, the participants in the Angles' transaction failed to heed the court's reasoning.  As we've already noted, Cloyd transferred the funds to Molseberry before a trust was in place; without a transfer into a trust, the tax analysis becomes quite different.  (The taxpayers in <u>Stern</u> and <u>Syufy</u> were also found to have legitimate reasons other than income-tax avoidance for their actions.)

Because <u>Stern</u> and <u>Syufy</u> do not apply in this situation, we are free to find that Cloyd retained control over Molseberry.  Perhaps our findings are best summed up by the Ninth Circuit itself in a different case:  "While it is possible that a rational person would send millions of dollars overseas and retain absolutely no control over the assets, we share the district court's skepticism."  <u>FTC v. Affordable Media, LLC</u>, 179 F.3d 1228, 1241 (9th Cir. 1999).

But if Cloyd's deal wasn't an exchange of stock for a private annuity, what exactly was it?  The only plausible answer is the Commissioner's:  Cloyd's transfer of his Cal-Almond stock to Molseberry was a contribution to its capital.  Molseberry was a foreign corporation and, as we have already found, Cloyd was the indirect owner of the Molseberry stock whose shareholders of record were his mere nominees.

Section 351(a) provides that there is no gain or loss recognized when one transfers property to a controlled corporation--i.e., a corporation in which one owns at least 80 percent of both the total voting power and the number of outstanding shares. Sec. 368(c). But Cloyd's transaction falls within section 367(c)(2), which applies to foreign corporations and limits the applicability of section 351(a) when the person transferring the property owns "at least 80 percent of the total combined voting power of all classes of stock of such corporation." Cloyd might argue that Molseberry was owned by Padang and Padang by three other entities, but the Code doesn't let him do so successfully--indirect ownership of a corporation is a form of constructive ownership described in section 318(a)(2)(C). And we specifically hold that, as elsewhere in tax law, indirect ownership includes situations where a nominee holds title for the actual, beneficial owner. See, e.g.,; Merino v. Commissioner, 196 F.3d 147, 150 (3d Cir. 1999), affg. T.C. Memo. 1997-385; Paymer v. Commissioner, 150 F.2d 334, 337 (2d Cir. 1945) (nominee corporation is one serving "no business purpose * * * and * * * intended to serve only as a blind to deter the creditors"); sec. 1.482-1(i)(4), Income Tax Regs. (in determining whether two entities are "controlled * * * by the same interests" for purposes of sec. 482, controlled means "any kind of control, direct or indirect, whether legally enforceable or not, and

however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose"). Section 367(c)(2) provides that when a controlled corporation is also foreign, the transfer of property is treated as if it were an exchange for stock in the foreign corporation equal in value to the fair market value of the property transferred. This has the effect of forcing an immediate recognition of any gain or loss which one would have realized upon selling the property to a third party. In other words, under section 367(c)(2), Cloyd has to recognize the entire gain on the Cal-Almond stock he transferred to Molseberry in 1995 rather than recognizing it only over the course of any annuity.

In 1995, there was only one exception to section 367(c)(2)'s recognition rules, in the temporary regulation now numbered section 1.367(a)-3(c), Income Tax Regs. That exception required that the U.S. transferor receive less than 50 percent of "the total voting power and the total value of the stock of the transferee foreign corporation" in exchange for domestic stock. Since Cloyd constructively received all of the voting power and all of the value of Molseberry's stock, he does not qualify for this exception. This means that we must treat Cloyd as if he received Molseberry stock equal to the fair market value of his Cal-Almond stock when he transferred it to the corporation. Cloyd therefore realized gain on the sale of Cal-Almond's assets

under section 367, and must recognize that gain in 1995 under section 1001.

II.  The Section 6662 Penalty

The Angles have conceded that they substantially understated their income tax liability for 1995 within the meaning of section 6662(d)(1)(A).[11]  However, they claim that they are not subject to the 20-percent accuracy-related penalty because, under all the facts and circumstances, they acted with reasonable cause and in good faith by relying on the professional advice of both Norman and Schneider.  See sec. 6664(c)(1); sec. 1.6664-4(b)(1), (c), Income Tax Regs.

We disagree that either Norman or Schneider specifically advised the Angles on how to complete their tax return in 1995. Although the record shows numerous opinion letters from both Norman and Schneider regarding the transaction as a whole, each of those letters is careful to point out that the tax benefits being described would be valid only if each recommended step was followed to the letter.  It was left to Cloyd to determine for himself whether he had followed those steps and could treat the transaction as described.

---

[11] Sec. 6662(d)(1)(A) states that a substantial understatement occurs when the understatement "exceeds the greater of--(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000."

Even if we found that both Norman and Schneider did specifically advise the Angles about their 1995 tax liability, we still find that the Angles didn't reasonably rely on that advice. We make this finding primarily on the fact that Cloyd didn't follow the steps outlined for him despite a warning that by not doing so, he would subject himself to taxes.  See <u>Garfield v. Commissioner</u>, T.C. Memo. 2006-267 (no evidence that taxpayer followed or sought professional advice); <u>O'Connor v. Commissioner</u>, T.C. Memo. 2001-90 (no reasonable reliance when taxpayer ignored accountant's advice).

We therefore find that the Angles did not act with reasonable cause and in good faith.  They are subject to a 20-percent accuracy-related penalty under section 6662(a) on the entire underpayment.

<u>Decision will be entered</u>

<u>under Rule 155</u>.