T.C. Memo. 2005-244

UNITED STATES TAX COURT

ERNEST I. KORCHAK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22105-03.                    Filed October 18, 2005.

<u>Robert T. Connors</u>, for petitioner.

<u>James Brian Urie</u> and <u>Gerald A. Thorpe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined additions to

petitioner's Federal income tax for 1982 of $7,019.40 under

section 6653(a)(1),[1] of an amount equal to 50 percent of the

interest due on a $140,388 underpayment under section

---

[1]All section references are to the Internal Revenue Code in
effect for the year in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.

6653(a)(2),[2] and of $34,322.10 under section 6659.[3] Respondent also determined that interest on the $140,388 underpayment must be assessed at 120 percent of the statutory rate under section 6621(c).[4]

The issues for decision are: (1) Whether petitioner is liable for the additions to tax under section 6653(a)(1) and (2); (2) whether petitioner is liable for the addition to tax under section 6659; (3) whether we have jurisdiction to decide if petitioner is liable for additional interest[5] under section

---

[2]Respondent concedes that the notice of deficiency incorrectly refers to sec. 6653(a)(1) and (2) as sec. 6653(a)(1)(A) and (B).

[3]Sec. 6659 was repealed by the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, sec. 7721(c)(2), 103 Stat. 2399, effective for tax returns due after Dec. 31, 1989, OBRA sec. 7721(d), 103 Stat. 2400. The repeal does not affect this case.

[4]Sec. 6621(c) was repealed by OBRA sec. 7721(b), 103 Stat. 2399, effective with respect to returns due after Dec. 31, 1989, OBRA sec. 7721(d). The repeal does not affect this case.

[5]In this opinion, the term "additional interest" means the interest prescribed by sec. 6601, with the rate of interest increasing to 120 percent of the underpayment rate under sec. 6621(c). White v. Commissioner, 95 T.C. 209, 214 (1990).

6621(c); and (4) if we have jurisdiction to decide a taxpayer's liability for additional interest under section 6621(c), whether petitioner is liable for additional interest under section 6621(c).[6]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioner resided in Bryn Mawr, Pennsylvania, when his petition in this case was filed.

The Plastics Recycling Transactions

This case is part of the Plastics Recycling group of cases. The additions to tax and interest arise from the disallowance of a loss, an investment credit, and an energy credit claimed by

---

[6]Petitioner also claimed in his petition that "The deficiencies as determined by the Commissioner are in income taxes for the calendar year 1982 in the amount of $140,388.00 of which at least $37,500.00 are in dispute." The $140,388, however, represents petitioner's allocable share of the adjustments respondent made to the items on Madison Recycling Associates' (Madison) Federal income tax return for 1982, and the notice of deficiency reflects only additions to tax under secs. 6653(a)(1) and (2) and 6659 and increased interest under sec. 6621(c). Petitioner did not dispute the $140,388 at trial or on brief, and we consider this argument abandoned. See Leahy v. Commissioner, 87 T.C. 56, 73-74 (1986).

Petitioner also claimed in his petition that respondent did not issue the required notices in connection with the partnership-level proceeding. See sec. 6223. Petitioner has not pursued this issue at trial or on brief, and we consider it abandoned. See Leahy v. Commissioner, supra.

petitioner with respect to a partnership known as Madison Recycling Associates (Madison).[7]  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993).  The parties have stipulated that the underlying transactions in this case are substantially similar to the transactions in Barlow v. Commissioner, T.C. Memo. 2000-339 (where we found that the underlying transactions at issue were substantially identical to the transactions in Provizer), affd. 301 F.3d 714 (6th Cir. 2002), and Provizer v. Commissioner, supra.

In a series of simultaneous transactions, Plastics Industries Group, Inc. (PI), sold[8] four Sentinel EPS Recyclers[9]

---

[7]Madison was formed on Oct. 1, 1982, by Richard Roberts (Mr. Roberts), as general partner, and Denise Sausa, as limited partner, and sold 18 limited partnerships at $50,000 per unit.

[8]Terms such as "sale" and "lease", as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes.  Similarly, terms such as "joint venture" and "agreement" are also used for convenience only and do not imply that the particular arrangement was a joint venture or agreement for Federal tax purposes.

[9]Sentinel EPS Recyclers were used in a process designed to transform scrap polystyrene into resin pellets that could be sold on the open market.

Although the transactions in Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), involved Sentinel EPE (expanded polyethylene) Recyclers, the recycling partnerships that leased both the Sentinel EPS and Sentinel EPE Recyclers are

(continued...)

(recyclers) to Ethynol Cogeneration, Inc. (ECI), for $1,520,000 each. ECI paid for the recyclers with $481,000 cash and a 12-year nonrecourse promissory note in the amount of $5,599,000, which was secured by a lien on the four recyclers.

ECI simultaneously resold the four recyclers to F&G Equipment Corp. (F&G) for $1,750,000 each. F&G paid for the recyclers with $553,000 cash and a 12-year promissory note in the amount of $6,447,000, 80 percent of which was nonrecourse. The nonrecourse portion of the note was senior to the recourse portion, and the note was secured by a second lien on the four recyclers.

F&G simultaneously leased the four recyclers to Madison, and Madison simultaneously entered into a joint venture agreement with PI and Resin Recyclers, Inc. (RRI), to place the recyclers with end users. Under the joint venture agreement, which was to last 9-1/2 years, Madison received a fixed, monthly joint venture fee equal to the monthly lease payment made to F&G. The fixed monthly joint venture fee also equaled the payments both F&G and ECI were obligated to make under their respective promissory

---

[9](...continued)
substantially identical. We shall refer to both Sentinel EPS and Sentinel EPE Recyclers as "recyclers". See Cohen v. Commissioner, T.C. Memo. 2003-303; Barlow v. Commissioner, T.C. Memo. 2000-339, affd. 301 F.3d 714 (6th Cir. 2002); Davenport Recycling Associates v. Commissioner, T.C. Memo. 1998-347, affd. 220 F.3d 1255 (11th Cir. 2000); see also Gottsegen v. Commissioner, T.C. Memo. 1997-314 (involving both EPE and EPS recyclers).

notes.  In connection with these arrangements, PI, ECI, F&G, RRI, and Madison entered into offset agreements so that the foregoing payments were bookkeeping entries only and were never in fact paid.[10]

Petitioner's Education and Professional Experience

In 1957, petitioner graduated from the University of Melbourne with a bachelor's degree in chemical engineering. Petitioner worked for 2 years at Imperial Chemical Industries (Imperial) in Australia and New Zealand as a research post engineer.  Petitioner worked on recycling and waste treatment projects while at Imperial; his first project there involved experimental work regarding the waste treatment of an aqueous wetland stream from a chemical plant.  Petitioner also participated in projects at Imperial that involved the treatment of internal streams for recycling.

In 1964, petitioner received a master's degree and a Ph.D. degree in chemical engineering from the Massachusetts Institute of Technology (MIT).  While at MIT, petitioner worked intermittently for Monsanto Research Corp. (Monsanto) in Everett, Massachusetts.  At Monsanto, petitioner performed experimental work on the treatment of waste products from a polyphenol

---

[10]The parties have stipulated that the relationships between Madison's general partner and the shareholders and officers of PI, ECI, F&G, and RRI are the same as those described in Barlow v. Commissioner, supra.

process[11] and created cost estimates relating to the waste treatment project.

After graduating from MIT, petitioner worked for the Scientific Design Corp. (SDC), a subsidiary of The Halcon SD Group, Inc. (Halcon), for 22 years. Petitioner worked as a research engineer while at SDC, and his duties included performing experimental work, evaluating the experimental work, using the evaluations for preliminary design plans, and determining preliminary investment costs and operation costs. When valuing equipment for SDC, petitioner initially sketched out a general outline of what equipment he thought would be required for a project and its installation costs, guessing at the cost. If the project appeared viable, petitioner used cost estimators whose job it was to develop a more detailed cost picture and to refine the cost estimates. During 1982, petitioner was SDC's president of research and development.

While at SDC, petitioner participated in a joint venture with Arco Chemical Co. (Arco), called Opstrand Corp. (Opstrand). The venture was based on petitioner's first project at SDC and

---

[11]Petitioner described the "polyphenol process" as follows:

Polyphenols were used as coolants for nuclear reactors, and as these coolants pass through the reactors, they are exposed to quite high temperatures and degrade to a certain extent unless they form higher polymers, which what we did with them is really to hydrogenate so they could basically break them down again into lower molecular polyphenols which could be reused in the process.

was dependent on internal recycling.  The nature of the recycle stream was relevant to the economics of the project.  The recycling process oxidized ethylbenzene and propylene to produce propylene oxide as the main product, and dehydrogenated methybenzyl alcohol to produce styrene, the monomer of polystyrene, as a secondary product.  SDC performed most of the technical work for the Opstrand venture, and Arco was responsible for the financing.

Petitioner's Investment History

Before 1980, petitioner's investment portfolio consisted of stocks and bonds.  In 1980, petitioner became a client of Marcus V. Cole (Mr. Cole), a financial adviser for Merrill Lynch.  In 1980, petitioner also purchased rental property on Hilton Head Island.

Petitioner's income increased significantly from 1980 to 1981 because of a $1 million bonus.  After he received the $1 million bonus, petitioner diversified his investments.  During 1981, petitioner invested in several limited partnerships, including at least three oil and gas partnerships.  Petitioner received documents related to the oil and gas investments, but he did not have anyone else review them.  During 1981, petitioner also invested in a bus rental activity.  Petitioner incurred losses as a result of the oil and gas investments and the bus and property rental activities.

Petitioner's Introduction to Madison

In 1982, petitioner continued to be employed by and receive wages from Halcon. During 1982, petitioner knew that his income for that year would be substantial.

Also during 1982, Mr. Cole joined the staff of Hamilton Gregg & Co. (HG&C), a personal financial planning firm. After joining HG&C, Mr. Cole proposed the Madison investment to petitioner in part because Mr. Cole thought it would appeal to petitioner given his background.

On or about December 6, 1982, petitioner became a client of HG&C. Hamilton S. Gregg II was the chairman and chief executive officer of HG&C. Hamilton Gregg Securities Corp. (HGSC), an SEC registered broker/dealer, and Hamilton Gregg Capital Corp. (HGCC), an SEC registered investment adviser, were affiliated with HG&C.[12] Mr. Cole was petitioner's financial adviser and primary contact person at HG&C during 1982.

---

[12]On or about Dec. 6, 1982, petitioner received and reviewed a document entitled "Hamilton Gregg & Company, Inc. SEC/ADV Brochure". The brochure informed petitioner that when an HG&C client's financial situation warranted advice concerning securities or private placement investments, HG&C would rely upon the advice of HGCC and HGSC and that such advice from an affiliated company would be disclosed to the client. The brochure also informed petitioner that HGSC was owned by the Gregg Group, Inc., that Hamilton S. Gregg II and the officers of HG&C were dually registered as investment adviser agents with HG&C and as registered representatives of HGSC, that proper disclosure was given to the client when an agent was acting in dual capacity, and that all of the affiliated subsidiaries shared some principals and employees with HG&C.

The Private Offering Memorandum

On or about November 24, 1982, petitioner received Madison's private offering memorandum (POM) and an accompanying cover memorandum from Mr. Cole. The POM informed potential investors that Madison's business would be conducted in accordance with the plastics recycling transactions described above. The POM also stated that

> The [partnership] Units are being offered through * * *
> [HGSC] as Placement Agent on a best efforts basis.
> * * * [HGSC] will be paid a selling commission equal to
> 10% of the per Unit offering price for each Unit sold.
> This selling commission may also be paid to other
> qualified broker-dealers as selling agents for each
> Unit sold by them.

Additionally, the POM listed significant business and tax risk factors associated with an investment in Madison. Specifically, the POM warned: (1) There was a substantial likelihood of an audit by the Internal Revenue Service (IRS); (2) the IRS may challenge the purchase price of the recyclers to be paid by F&G to ECI as being in excess of the recyclers' fair market value; (3) the partnership had a limited operating history; (4) the general partner had limited experience in marketing recycling or similar equipment; (5) the limited partners would have no control over the conduct of the partnership's business; (6) there was no established market for the recyclers and they had no history of commercial use; (7) patent protection would not be sought for the recyclers; (8) there were no assurances that market prices for

virgin resin would remain at then-current prices per pound or that the recycled pellets would be as marketable as virgin resin pellets; and (9) certain potential conflicts of interest existed. The POM also stated on its first page that **"THIS OFFERING INVOLVES A HIGH DEGREE OF RISK"** and repeatedly urged potential investors to seek independent advice and counsel before investing in Madison.

The POM stated that the projected tax benefits for the initial year of investment for an investor contributing $50,000 would include investment and energy tax credits in the aggregate amount of $77,000, plus tax deductions in the amount of $38,610. The POM also stated that, assuming each recycler processed an average of 1,872,000 pounds of polystyrene scrap per year and the market price of virgin pellets increased approximately 11 percent annually over the term of the venture, the net projected profits to the partnership through 1992 would equal $2,873,144.[13]

---

[13]The POM projected net profits over the life of the venture as follows:

| | |
|------|---------|
| 1982 | -0- |
| 1983 | $40,365 |
| 1984 | 185,679 |
| 1985 | 213,531 |
| 1986 | 245,560 |
| 1987 | 282,394 |
| 1988 | 324,754 |
| 1989 | 373,467 |
| 1990 | 429,487 |
| 1991 | 493,909 |
| 1992 | 283,998 |

The POM included a marketing report by Stanley Ulanoff (Mr. Ulanoff), a marketing consultant and professor, and a technical opinion by Samuel Z. Burstein, a mathematics professor.  The POM also included a tax opinion by the law firm of Boylan & Evans concerning the tax issues involved in the plastics recycling program (general partner opinion).  The general partner opinion was addressed to Richard Roberts (Mr. Roberts), the general partner of Madison, and stated that it was intended for Mr. Roberts's "own individual guidance and for the purpose of assisting prospective purchasers and their tax advisors in making their own analysis, and no prospective purchaser is entitled to rely upon this letter."  The general partner opinion also warned that the projected investment and energy credits would be reduced or eliminated if the partnership could not demonstrate that the price paid for the recyclers approximated their fair market value.  The general partner opinion did not purport to rely on any independent confirmation of the fair market value of the recyclers, however.  Instead, the opinion relied on Mr. Ulanoff's conclusion that the purchase price to be paid by F&G was reasonable and on representations by PI, ECI, F&G, and Madison that the prices paid by ECI and F&G and the terms of the lease were negotiated at arm's length.  The opinion concluded that the basis upon which the partnership's aggregate investment and

energy tax credits would be computed would equal the price F&G paid for the recyclers.  The opinion was not signed.

Mr. Cole's cover letter specifically directed petitioner's attention to the section of the POM entitled "Tax Benefits" and to the Boylan & Evans opinion.  The cover letter also informed petitioner that HGSC had received an additional opinion from Boylan & Evans on behalf of the limited partners (limited partner opinion) that would be available upon request after the closing of the partnership and that Madison's general partner would reimburse HGSC for the expense incurred in obtaining the opinion. Correspondingly, the POM estimated that Madison would use $45,000 of the offering proceeds to reimburse HGSC for legal fees.[14]

Petitioner read both the cover letter and the POM. Petitioner did not show the POM to his tax return preparer because he considered HG&C to be his tax adviser and because HG&C went over the POM and sought a legal opinion regarding the investment.  Petitioner was aware at that time, however, that HG&C did not have a background in chemical engineering. Petitioner was also aware that Mr. Cole was neither a plastics recycling expert nor a chemical engineering expert and that Mr. Cole did not have the knowledge required to assess the accuracy of the financial projections contained in the POM.

---

[14]The parties stipulated that HG&C, rather than HGSC, paid Boylan & Evans $45,000 to obtain the limited partner opinion and was reimbursed by Madison.

On November 30, 1982, petitioner signed MADISON RECYCLING ASSOCIATES SUBSCRIPTION AGREEMENT AND PURCHASER SUITABILITY REPRESENTATIONS (agreement), agreeing to purchase 1-1/2 units of Madison for $75,000. Petitioner was aware of the risks addressed in the POM when he signed the agreement. Petitioner was also aware that if he invested in Madison, he would receive tax benefits greater than the amount of his investment.

Petitioner's Investigation of Madison

In addition to reading the POM and cover letter, petitioner performed an economic analysis, using information in the POM, to determine whether it was reasonable for him to invest in Madison. Petitioner calculated the potential return on the investment to both Madison and himself, as well as the financial incentives of the other companies involved in the venture to participate in the investment. Petitioner also calculated the expenses he believed end users would save by disposing of polystyrene foam using Madison rather than transporting the foam by truck. Petitioner concluded that there would be a good return for all of the parties he considered, and he hoped for an 18-percent return on his investment. Although petitioner had no expertise in marketing plastics or the recycled resin pellets Madison was supposed to produce, he performed the calculations regarding the investment himself because he believed he could address them better than most people.

Petitioner also attempted to analyze the value of the recyclers because he initially felt that the $1.5 million cost per recycler did not make sense. However, he found it difficult to determine the value of the actual recyclers. After looking at the design of the equipment and the process as a whole, however, petitioner believed that the cost of $1.5 million per recycler was reasonable. Petitioner also believed that the relationship between the annual rental cost and the value of the recyclers contained in the POM was reasonable because the relationship resembled that in his bus investment. Petitioner did not visit PI or observe a recycler in action before investing in Madison.[15]

In making his calculations, petitioner testified that he did not rely solely on the figures in the POM. Petitioner took what he believed to be a more conservative discount for the "virgin material" and used more conservative estimates for the price of polystyrene and the projected return on the investment. Petitioner believed there was a direct relationship between the price of oil and the price of polystyrene and its components, and he consulted various sources regarding the price of crude oil, polystyrene, and related products. Additionally, petitioner contacted Madison's general partner, Mr. Roberts, about the partnership. Petitioner asked Mr. Roberts about the investment

_____

[15]Petitioner did ask for a recycler manual. The record does not disclose, however, whether petitioner ever received or reviewed such a manual.

generally, the basis for the polystyrene forecasts contained in the POM, the history of the equipment, and whether and how the equipment was running. Petitioner never spoke with an expert in plastic recycling either before or after he made his investment, however, because he felt he had a better understanding than most regarding the technology of styrene, polystyrene, and recycling.

In performing his research, petitioner considered that Madison had no operating history, and he was aware that the POM stated that "[PI] has no experience in the manufacturing and operation of the Sentinel EPS Recyclers, nor does RRI or PI have any experience in using or selling the resin pellets resulting from the second stage of recycling." Mr. Roberts informed petitioner, however, that, contrary to the statements in the POM, PI had been running the recyclers for some time.

Petitioner did not seek independent legal advice regarding Madison between November 24, 1982, the date he received the POM, and November 30, 1982, the date he invested in Madison. Petitioner did request, however, a copy of the limited partner opinion referenced in the HG&C cover letter accompanying the POM. Petitioner received the limited partner opinion sometime after December 21, 1982, the date Mr. Roberts countersigned the agreement, and after petitioner had tendered his money for the investment. The limited partner opinion was nearly identical to the general partner opinion. The only differences were that the

limited partner opinion was addressed to the limited partners rather than the general partner, contained no statement that the limited partners could not rely on the opinion, included a section on the impact of the investment on State and local taxes, and was signed by Boylan & Evans.  Petitioner believed Boylan & Evans worked for Madison at the time it issued the limited partner opinion.  Petitioner reviewed the limited partner opinion before he filed his 1982 tax return, compared it to the general partner opinion, and relied on its assessment of the risks described in the POM.

On or around January 12, 1983, petitioner received a letter from Mr. Roberts confirming the close of the partnership on December 21, 1982, and transmitting an executed copy of petitioner's subscription agreement.

Petitioner's Monitoring of the Madison Investment

On or around March 9, 1983, petitioner received a Financial Planning Report (report) and corresponding cover letter prepared by HG&C.  Petitioner reviewed the cover letter and report.  The report informed petitioner that he had invested $850,000 in "limited partnerships with tax advantages" and, among other things, the report promoted HGSC and participation in "tax-sheltered investments".  The report further informed petitioner that if he invested in a tax sheltered investment,

> [HGSC] will receive a commission on the sale.  Also,
> because [HGSC] is an affiliate of our organization, we

> cannot act as your offeree representative. You should
> seek guidance from a tax attorney or CPA who is
> qualified to give you advice in this matter.

The report also notified petitioner that HG&C would "endeavor to keep * * * [him] informed of developments as they occur with Madison Recycling" so that petitioner believed HG&C would alert him if something went wrong with the Madison investment.

After the spring of 1983, petitioner received documents from Madison, including reports from RRI on how many pounds of polystyrene were bought, processed, and sold. To monitor his investment, petitioner kept in touch with HG&C and read the reports. From the spring of 1983 through 1987, however, petitioner took no action regarding his investment, even though Madison was performing poorly.

Madison's and Petitioner's Tax Returns

On March 14, 1983, Madison filed its Form 1065, U.S. Partnership Return of Income, for 1982. Madison reported that the four recyclers had an aggregate basis of $7 million, or $1,750,000 each, for purposes of investment and energy tax credits. Madison also reported a net ordinary loss of $704,111. Petitioner's allocable share of the bases, credits, and losses was passed through to him and reported on a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc. - 1982.

Petitioner received his Schedule K-1 from Mr. Roberts on or around February 1, 1983. Petitioner reviewed the Schedule K-1

and provided it to his tax return preparer, who did not question the Schedule K-1 or the Madison investment when preparing petitioner's return. Petitioner reviewed and signed his Form 1040, U.S. Individual Income Tax Return, for 1982, which was filed with respondent on May 6, 1983.

On his 1982 return, petitioner reported gross income of $317,784, which was derived from $567,723 of wages, dividends, interest, and other income, a $24,961 loss from the bus rental activity, a $30,010 loss from his Hilton Head rental activity, $131,876 of losses from his oil and gas partnerships, and a $58,089 loss from Madison. Petitioner also claimed a $116,492 investment credit, which consisted of a $59,835 regular investment credit and a $56,657 business energy investment credit, and he reported a $577,500 basis in the recyclers as qualified investment property. Due to his losses and credits, petitioner's tax was reduced to $3,198, and he reported an overpayment of $92,970. Petitioner received a corresponding refund.

Respondent's Examination of Madison

On or about February 19, 1985, respondent issued to Mr. Roberts, as Madison's tax matters partner, a Notice of the Beginning of an Administrative Proceeding at the Partnership Level With Respect to Partnership Items (NBAP), which stated that the IRS was commencing an examination of partnership items

reported on Madison's 1982 return.  Shortly thereafter,
petitioner received a copy of the NBAP from Mr. Roberts.
Petitioner also received a letter from Mr. Roberts informing him
that Madison would keep him advised of all pertinent developments
regarding the audit and related matters.  Petitioner showed the
letter to his tax return preparer.

On December 24, 1987, respondent issued to Madison a Notice
of Final Partnership Administrative Adjustment (FPAA) for 1982
and 1983.  Petitioner received a copy of the FPAA.

In the FPAA, respondent adjusted both the investment tax
credit and business energy investment credit property basis from
the $7 million Madison had reported to zero and explained that
"The investment tax credit and the business energy investment
credit in the amount of $7,000,000.00 for the year 1982 is
disallowed because you have not established the amount, if any,
of qualified investment and the extent, if any, of entitlement to
the credit."  In the Explanation of Partnership Adjustments
accompanying the FPAA, respondent further explained:

> All items of income, loss deductions and credits
> reported with respect to your equipment leasing
> activities for the years 1982 and 1983 are disallowed.
> For purposes of federal income taxation you cannot be
> considered the owner or lessee of the equipment with
> respect to which said items of income, loss, deductions
> and credits are reported because, after examination of
> all of the facts and circumstances, you are found not
> to have incurred the benefits and burdens of ownership
> or lease of the equipment or to have made, in
> substance, a true economic investment in the equipment.
> The transactions entered into with respect to you [sic]

> nominal equipment leasing activities were either shams
> or devoid of the substance necessary for recognition
> for federal income tax purposes, and the transactions
> were not, in substance, true leases.

Respondent also explained that the partnership's tax benefits were disallowed because the partnership (1) did not engage in or conduct for profit the activity of the acquisition of and transfer of right in the recyclers, (2) failed to substantiate its deductions, and (3) failed to show that the deductions were incurred, constituted ordinary and necessary business expenses, were properly paid or accrued, or were deductible in the year claimed.  Respondent also stated that, because the liabilities to which the recyclers were subject were "nonrecourse, contingent and lacking in true economic substance, they cannot be considered a component of the value of the equipment" for purposes of computing tax credits or the value of the equipment for any other reason.

An attachment entitled "INFORMATION REGARDING ADDITIONS TO TAX" was also included with the FPAA.  The attachment referenced sections 6653(a), 6659, and 6621(c), indicated that the sections would be applied in appropriate cases, and stated that amounts determined under those sections would be assessed separately after the completion of the partnership proceeding.

Petitioner's Post-FPAA Activities

In late 1987 or early 1988, after respondent had issued the FPAA, petitioner performed an analysis of the economics of the

Madison investment.  Petitioner also sought out other Madison partners and contacted approximately 30 companies to assess the relevant market.  Additionally, petitioner contacted PI regarding the investment, went to look at the recyclers, proposed changes to Madison's original business plan, and spent approximately 2 months attempting to have the recyclers at PI placed with end users.  However, petitioner discontinued his efforts to resurrect Madison because PI was uncooperative.

The Partnership Litigation

On May 17, 1988, a partner other than Madison's tax matters partner filed a petition in this Court (docket No. 10601-88) to challenge the determinations made in the FPAA.  On April 9, 2001, we filed an opinion in docket No. 10601-88, see Madison Recycling Associates v. Commissioner, T.C. Memo. 2001-85, affd. 295 F.3d 280 (2d Cir. 2002), holding that Madison was a partnership subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, and that the period of limitations on assessment had not expired before the FPAA was issued.[16]  The opinion was affirmed on appeal, and our decision sustaining respondent's partnership adjustments became final on October 7, 2002.

---

[16]By the time we issued our opinion in Madison Recycling Associates v. Commissioner, T.C. Memo. 2001-85, affd. 295 F.3d 280 (2d Cir. 2002), the parties to the decision had agreed that respondent's adjustments in the FPAA were correct.

Respondent's Affected Items Adjustments

On October 6, 2003, respondent issued a notice of deficiency (notice) for 1982 to petitioner. Respondent determined that petitioner was liable for additions to tax under sections 6653(a)(1) and (2) and 6659, and increased interest under section 6621. In the Form 886-A, Explanation of Items, accompanying the notice, respondent explained that he had adjusted petitioner's reported basis in the recyclers to zero and disallowed the loss and the investment and business energy credits petitioner claimed with respect to Madison pursuant to our decision in docket No. 10601-88. In Form 4549A, Income Tax Examination Changes, accompanying the notice, respondent informed petitioner that the notice reflected only additions to tax.

On December 29, 2003, petitioner's petition disputing respondent's adjustments, denying that petitioner had acted negligently in the preparation of his tax return or in the valuation of the assets on the underlying return, and denying that he had engaged in a tax-motivated transaction was filed. The resulting case was tried on September 9, 2004, and both parties submitted posttrial briefs.

## OPINION

We have decided many Plastics Recycling cases. Most of these cases, like the present case, raised issues regarding additions to tax for negligence and valuation overstatement.

See, e.g., <u>Thornsjo v. Commissioner</u>, T.C. Memo. 2001-129; <u>West v. Commissioner</u>, T.C. Memo. 2000-389; <u>Barber v. Commissioner</u>, T.C. Memo. 2000-372; <u>Barlow v. Commissioner</u>, T.C. Memo. 2000-339; <u>Ulanoff v. Commissioner</u>, T.C. Memo. 1999-170; <u>Merino v. Commissioner</u>, T.C. Memo. 1997-385, affd. 196 F.3d 147 (3d Cir. 1999); <u>Gottsegen v. Commissioner</u>, T.C. Memo. 1997-314.  In all but two of these cases, we found the taxpayers liable for the additions to tax for negligence.[17]  In all of these cases in which the issue was presented, we found the taxpayers liable for additions to tax for overvaluation.

In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, the test case for the Plastics Recycling cases, we (1) found that each recycler had a fair market value of not more than $50,000; (2) held that the transaction, which is virtually identical to the transaction in the present case, was a sham because it lacked economic substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the recyclers; and (5) held that the partnership losses and tax credits claimed with respect to

---

[17]In <u>Dyckman v. Commissioner</u>, T.C. Memo. 1999-79, and <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382, we held that the taxpayers were not negligent with respect to their participation in the plastics recycling program.  Both cases involved unusual circumstances not present in this case.

the partnership at issue were attributable to tax-motivated transactions within the meaning of section 6621(c). We also found that other recyclers were commercially available during the year in issue,[18] and we relied heavily on the overvaluation of the recyclers in reaching the conclusion that the transaction lacked a business purpose. Id.

A.    Section 6653(a)(1) and (2)

Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of the rules. Respondent's determination of negligence is presumed correct, and petitioner has the burden of proving that he was not negligent.[19] See Rule 142(a); Welch

---

[18]See also, e.g., Barlow v. Commissioner, T.C. Memo. 2000-339; Ferraro v. Commissioner, T.C. Memo. 1999-324; Ulanoff v. Commissioner, T.C. Memo. 1999-170; Merino v. Commissioner, T.C. Memo. 1997-385, affd. 196 F.3d 147 (3d Cir. 1999), where we found that several machines capable of densifying polyethylene and polystyrene were commercially available in 1982 for $20,000 to $200,000.

[19]Effective for court proceedings arising in connection with examinations commencing after July 22, 1998, sec. 7491(c) places the burden of production on the Commissioner with respect to a taxpayer's liability for penalties and additions to tax. Petitioner does not contend, nor is there any evidence, that his examination commenced after July 22, 1998 or that sec. 7491(c) is

(continued...)

v. Helvering, 290 U.S. 111, 115 (1933); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayer and the manner in which he approached his investment. See Merino v. Commissioner, 196 F.3d 147, 154 (3d Cir. 1999) ("The inquiry into a taxpayer's negligence is highly individualized, and turns on all of the surrounding circumstances including the taxpayer's education, intellect, and sophistication."), affg. T.C. Memo. 1997-385; see also McPike v. Commissioner, T.C. Memo. 1996-46; Turner v. Commissioner, T.C. Memo. 1995-363.

A taxpayer may avoid liability for the addition to tax for negligence under section 6653(a)(1) and (2) if he reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). However, reliance on professional advice,

---

[19](...continued)
applicable in this case.

standing alone, is not an absolute defense to negligence; rather, it is a factor to be considered.  Neonatology Associates, P.A. v. Commissioner, 299 F.3d 221, 234 (3d Cir. 2002) ("the reliance itself must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about"), affg. 115 T.C. 43 (2000); Freytag v. Commissioner, supra.  In order to establish that he reasonably relied on competent professional advice, the taxpayer must show that the adviser had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.[20]  David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621;

---

[20]Petitioner relies on Thompson v. United States, 223 F.3d 1206 (10th Cir. 2000), to support an argument that a trier of fact is obligated to accept a taxpayer's reliance on professional advice as a defense to the negligence addition to tax under sec. 6653.  However, Thompson does not support petitioner's argument.  In Thompson, the Court of Appeals for the Tenth Circuit upheld a jury instruction that reasonable, good-faith reliance on a professional adviser constitutes a defense to the negligence addition to tax under sec. 6653.  The Court of Appeals found that the instruction was warranted based on (1) the evidence in the case, which included testimony regarding the adviser's expertise, his investigation of the investment and his conclusions therefrom, and the information he provided the taxpayer; (2) the professional relationship between the adviser and the taxpayer; and (3) the rule that a taxpayer may reasonably rely on advice when that advice involves the application of the adviser's relevant expertise.  Thompson v. United States, supra at 1210-1211.

Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

A taxpayer's reliance on representations by insiders, promoters, or offering materials is not sufficient to establish that a taxpayer reasonably relied on competent professional advice. Neonatology Associates, P.A. v. Commissioner, supra; Goldman v. Commissioner, supra at 408; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Berry v. Commissioner, T.C. Memo. 2001-311; Ferraro v. Commissioner, T.C. Memo. 1999-324. Pleas of reliance have also been rejected when the adviser knew nothing about the nontax business aspects of the contemplated venture. See Freytag v. Commissioner, supra at 888; Beck v. Commissioner, 85 T.C. 557, 572-573 (1985); Buck v. Commissioner, T.C. Memo. 1997-191.

Petitioner contends that he acted with due care and did not fail to do what a reasonable or ordinarily prudent person would do under the circumstances because: (1) His background was in the fields necessary for him to have conducted a thorough analysis of the scientific and economic merits of the investment, and he conducted such an analysis; (2) he relied on his tax return preparer, HG&C, and Boylan & Evans; and (3) he invested in Madison primarily to earn a profit and only secondarily for its

tax benefits.  Petitioner also contends that respondent's determination of negligence is not entitled to a presumption of correctness in this case and that petitioner, therefore, should not bear the burden of proof on the issue of negligence.

1.   Petitioner's Burden of Proof Argument

Petitioner contends that because the inquiry into an individual's negligence is highly individualized and turns on the surrounding circumstances, respondent's determination should not be entitled to a presumption of correctness "if he has not made any inquiry into those individualized circumstances before asserting the penalty".  Petitioner also contends that respondent should bear the burden of proof on the issue.  Petitioner concedes, however, that section 7491(c) does not apply to this case and that his position is not supported by caselaw.

It is well established that a determination of negligence by the Commissioner is entitled to a presumption of correctness and that the burden is on the taxpayer to establish that the Commissioner's determination is incorrect.  See, e.g., Rule 142(a); Welch v. Helvering, 290 U.S. at 115; Luman v. Commissioner, 79 T.C. at 860-861; Bixby v. Commissioner, 58 T.C. at 791-792; Berry v. Commissioner, supra; Barlow v. Commissioner, T.C. Memo. 2000-339; Kowalchuk v. Commissioner, T.C. Memo. 2000-153; Ferraro v. Commissioner, supra.  Petitioner concedes that his arguments are not supported by caselaw, and he has failed to

show that respondent's determination is not entitled to the presumption of correctness.  Petitioner, therefore, bears the burden of proof on this issue.

   2.  Petitioner's Reasonableness Argument

      a.  Petitioner's Analysis of Madison

Petitioner contends that he exercised the due care of a reasonable and ordinarily prudent person by performing a scientific and economic analysis of Madison.  Petitioner supports his contention by arguing that his reasonableness is evidenced by his review of the POM, his review of Government and private sector publications that predicted oil prices would continue to rise, his analysis of the incentives for the parties to the venture, and his projected 18-percent return for himself over the life of the venture.  Petitioner, however, has failed to establish that he gave due consideration to the numerous caveats and warnings in the POM, that he was qualified to value the recyclers and related equipment, or that he otherwise acted reasonably in performing his analysis of Madison.

In determining that Madison was an economically viable investment, there is no evidence that petitioner considered Mr. Roberts's lack of relevant experience, the lack of market and patent protection for the recyclers, or the uncertainty of future virgin resin prices and the marketability of recycled pellets. Petitioner also ignored the inconsistency between the POM's

warnings that PI had no experience in manufacturing or operating the recyclers and Mr. Roberts's statement that PI had been running the recyclers for some time. Although this inconsistency should have alerted petitioner that further investigation was warranted, he did not investigate further. Petitioner also failed to show that his efforts to evaluate the economics of the Madison transaction were reasonable or that he relied on reasonable assumptions.[21] An examination of petitioner's arguments in relationship to the record in this case demonstrates why.

Although petitioner testified that, in addition to his reliance on the POM, he made his own more "conservative estimates" in performing his economic analysis, he provided no

_____

[21]For example, petitioner argued that the "so-called oil crisis" of the late 1970s and early 1980s provided the historical backdrop for his investment in Madison and that his calculations were dependent on his assumption that the price of polystyrene and oil were connected and that the price of oil would rise. The argument that it was reasonable for a taxpayer to invest in a plastics recycling partnership because of the "so-called oil crisis" and the belief that the price of plastic would increase because it is an oil derivative has been made in more than 20 Plastics Recycling cases. See, e.g., Ferraro v. Commissioner, T.C. Memo. 1999-324; Merino v. Commissioner, T.C. Memo. 1997-385; Singer v. Commissioner, T.C. Memo. 1997-325; Sann v. Commissioner, T.C. Memo. 1997-259, affd. sub nom. Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000). We have found this argument unpersuasive in every one of these cases. The Court of Appeals for the Third Circuit also has rejected the argument as unpersuasive. Merino v. Commissioner, 196 F.3d 147 (3d Cir. 1999). Petitioner's argument is substantially the same as that rejected in the above-cited cases and does not provide a reasonable basis for petitioner's analysis or for his investment in Madison.

explanation of how he arrived at these estimates.  We are unable
to determine from the record whether petitioner's estimates were
reasonable under the circumstances.

Petitioner also argues that the cost per recycler was
reasonable based on his examination of the recyclers' design and
"the process as a whole".  However, petitioner did not visit PI,
he did not inspect a recycler, and he did not observe the
recycling process before making his investment in Madison or
filing his 1982 return.  Although petitioner claimed that he
requested a copy of the recycler manual, petitioner did not
introduce any evidence that he actually received or reviewed the
manual before making his investment.  Petitioner also admitted he
had difficulty ascertaining the actual value of the recycler.
Even if we accept petitioner's assertion that he had the
requisite education and experience to conduct a reasonable
evaluation of the Madison recyclers and the recyling process,
petitioner has not established that he had the factual
information necessary to evaluate the recyclers' design or the
merits of the recycling process as a whole.

Petitioner's argument is also based on a faulty premise.  In
Merino v. Commissioner, T.C. Memo. 1997-385, we rejected the
valuation of a recycler in the context of the "overall system" as
unreasonable because it assumed that the underlying sham
transaction was valid.  Like the taxpayer in Merino, petitioner

assumed that the simultaneous sales of the recyclers were meaningful economic transactions that would be respected for tax purposes. Petitioner made no effort to evaluate the tax aspects of the Madison transactions beyond reviewing the Boylan & Evans tax opinions, and he did not obtain an evaluation of the Madison investment from an independent and competent tax professional.

Finally, petitioner failed to prove that his reliance on his bus rental activity, another investment that was reaping large tax benefits for petitioner, to validate his Madison investment was reasonable. Petitioner did not introduce any evidence to establish that there was any legitimate economic or legal reason for comparing the two investments, that he had adequately and reasonably investigated the bus rental activity before investing in it, or that the bus investment had itself withstood scrutiny by respondent.

Although petitioner is a highly educated man with substantial experience in chemical engineering, petitioner did not exercise the kind of due diligence that a reasonable and prudent person with his education and experience should have exercised under the circumstances. He did not visit or inspect the recyclers, he did not observe and evaluate the recycling process, he did not obtain a professional appraisal of the value of the recyclers even though he had doubts about their value, and he did not obtain an independent evaluation of the tax

aspects of the Madison transactions despite the warnings contained in the POM. Consequently, we conclude that petitioner's investigation of the Madison investment was not reasonable.

### b. Petitioner's Reliance on Advisers

Petitioner also contends that he acted reasonably, in part, because (1) he heeded the warnings in the POM and delegated his tax return preparation to his longstanding tax return preparer, (2) he relied on HG&C to monitor his investment, and (3) he requested and reviewed the Boylan & Evans limited partner opinion. Petitioner argues that "Not one of these three professionals ever advised Petitioner that anything was amiss. * * * What more could a reasonable and prudent person, not versed in tax law, do to fulfill his duty to the Commissioner? Infallibility is not required." We are not persuaded that petitioner's reliance was reasonable.

### i. Petitioner's Tax Return Preparer

The warnings about the potential for an audit and the promises of large tax benefits contained in the POM should have caused a prudent investor to question the legitimacy of the promised tax benefits. Petitioner, however, did not provide his tax return preparer with a copy of the POM or ask him to evaluate the Madison investment before petitioner invested in it. Petitioner nevertheless argues that relying on his return

preparer was reasonable because petitioner provided him with Madison's Schedule K-1 and because petitioner's return preparer prepared petitioner's 1982 return using the Schedule K-1 without questioning the investment. Petitioner's argument does not persuade us.

Petitioner admitted that he did not give the POM to his return preparer, and he did not ask his return preparer to evaluate the Madison investment before he made it. These facts alone are enough to reject petitioner's argument. Petitioner also failed to present any evidence that the return preparer had the necessary experience, training, or information to evaluate the Madison investment, even if petitioner had asked him to perform an evaluation. Petitioner has not carried his burden of proving that his claimed reliance on his return preparer was credible or reasonable.

### ii.  HG&C

Petitioner contends that he did not provide the POM to his tax return preparer because he believed HG&C was his tax adviser and because HG&C went over the POM in detail and obtained the Boylan & Evans limited partner opinion. Petitioner's reliance on HG&C was not reasonable, however, because he knew that HG&C had no background in plastics recycling technology and that Mr. Cole, his primary contact at HG&C, not only lacked expertise in

plastics recycling technology but also lacked the knowledge necessary to assess the accuracy of the financial projections contained in the POM.

Petitioner's claimed reliance on HG&C was also unreasonable because petitioner should have known HG&C had a conflict of interest in advising petitioner to invest in Madison. On November 24, 1982, petitioner received Madison's POM from Mr. Cole, an HG&C employee. The POM informed petitioner that HGSC and any other qualified broker-dealer would receive a 10-percent commission for Madison units sold by them. On or around December 6, 1982, petitioner became a client of HG&C, and HG&C informed petitioner that it was affiliated with HGSC, that it relied on HGSC in providing investment advice, and that the two entities shared some principals and employees. On or around March 9, 1983, HG&C provided petitioner with a report that promoted the use of HGSC and tax-sheltered investments and informed petitioner that HGSC would receive a commission if petitioner participated in a tax-sheltered investment.

Petitioner's claimed reliance on HG&C was neither credible nor reasonable.

### iii.  Boylan & Evans

Petitioner also claims he reasonably relied on the Boylan & Evans limited partner opinion. However, petitioner admitted that he believed Boylan & Evans worked for Madison when it

issued the opinion.  Furthermore, the limited partner opinion prepared by Boylan & Evans made clear that Boylan & Evans had not independently investigated the Madison transactions.  These facts should have alerted petitioner that the limited partner opinion was more like offering material than independent advice and that it was unreasonable to rely on the limited partner opinion in claiming Madison-related tax benefits.

An additional reason to reject petitioner's claim of reliance is that petitioner did not receive the limited partner opinion until after he had already invested in the Madison partnership.  Although petitioner had read the general partner opinion contained in the POM, the opinion clearly stated that no one but the general partner could rely on it.  Petitioner could not have relied on the limited partner opinion in deciding to invest in the Madison partnership because he did not see it until after he had invested.

c.  Profit Motive

Petitioner also contends that he acted reasonably in investing in Madison because he intended to make a profit from his investment and considered the tax benefits secondary. Petitioner supports this contention by arguing that he (1) lacked employment security, (2) had other energy-related investments, (3) "did not know his tax status" until his return was complete in May 1983, (4) did not use the investment to

carry back losses and credits to prior tax years, and (5) attempted to monitor and resurrect the investment. Again, we must reject petitioner's argument.

We find it incredible that someone with petitioner's education and experience would rely on an investment in Madison to ease immediate employment concerns. Madison did not offer sufficient cashflow to petitioner to operate as a substitute for petitioner's salary, even if the representations in the POM were accepted at face value.

We also find incredible petitioner's claim that he did not know his "tax status" before he invested in Madison. Even if petitioner was unaware of the exact amount of his 1982 tax liability when he invested in Madison, he admitted at trial that he knew his income from Halcon in 1982 would be substantial. A person with petitioner's education and experience who knew his 1982 income would be substantial would certainly have reason to believe that he was facing a significant tax liability for 1982.

Petitioner's argument that his choice not to invest more than $75,000 in Madison demonstrates a secondary concern about tax benefits also defies logic. Claiming large tax benefits rather than even larger tax benefits does not evidence a profit motive. Furthermore, if petitioner truly had a profit motive, the argument could just as easily be made that he would have invested a larger amount in Madison to get a larger profit.

Finally, petitioner's attempts to monitor and salvage his Madison investment do not demonstrate that petitioner made his investment in Madison primarily to make a profit.  His attempts are consistent with a concern about losing his $75,000 investment but do not disprove a concern about tax benefits.

####    d.    Conclusion

When petitioner filed his 1982 return, he had some investment experience and the knowledge and experience associated with a successful career as a chemical engineer. However, petitioner has failed to establish that he reasonably investigated or analyzed Madison, or that he reasonably relied on competent and informed professional advice in deciding to invest in Madison and in claiming Madison's tax benefits on his 1982 return.  We hold, therefore, that petitioner is liable for the section 6653(a)(1) and (2) additions to tax for negligence.

### B.    Section 6659

Under section 6659, a graduated addition to tax is imposed if an individual has an underpayment of at least $1,000 that is attributable to a valuation overstatement.  Sec. 6659(a), (d). A valuation overstatement exists if the value of any property, or the adjusted basis of any property, claimed on any return exceeds 150 percent of the amount determined to be the correct amount of such valuation or adjusted basis.  Sec. 6659(c)(1). If the claimed valuation exceeds 250 percent of the correct

value, the addition to tax is equal to 30 percent of the underpayment. Sec. 6659(b). Petitioner bears the burden of proving that respondent's determination of the section 6659 addition to tax is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. at 860-861.

Petitioner claimed an investment tax credit based on a purported basis in the recyclers of $577,500, petitioner's allocable share of Madison's purported $7 million basis in the recyclers. In the FPAA, however, respondent determined that Madison's actual basis in the recyclers was zero, in part because Madison was a sham and lacked economic substance. Respondent adjusted petitioner's return in accordance with Madison's examination results, reducing both his basis of $577,500 in the recyclers to zero and his Madison-related credits to zero. If the disallowance of petitioner's claimed tax benefits is attributable to the valuation overstatement of his basis in the recyclers, he is liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the tax benefits claimed with respect to Madison unless he establishes that he is entitled to a waiver of the penalty under section 6659(e). E.g., Thornsjo v. Commissioner, T.C. Memo. 2001-129.

Petitioner contends that section 6659 does not apply in this case because (1) respondent's disallowance of the claimed

tax benefits was attributable to other than a valuation overstatement, and (2) respondent erroneously failed to waive the section 6659 addition to tax.  We reject each of these arguments for the reasons set forth below.

1.    The Grounds for Petitioner's Underpayments

Section 6659 does not apply to an underpayment of tax that is not attributable to a valuation overstatement.  See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent a taxpayer claims tax benefits that are disallowed on grounds separate and independent from an alleged valuation overstatement, the resulting underpayment of tax is not attributable to a valuation overstatement.  Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994).  However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable.  See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995).

Petitioner contends that the section 6659 addition to tax does not apply in his case because "the Commissioner totally disallowed all credits and deductions in the underlying TEFRA

action, [so that] there is no valuation overstatement, but rather an underpayment attributable to improper deductions and credits." Petitioner relies on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, to support his argument. Petitioner's reliance is misplaced.

In Heasley, the taxpayers had not graduated from high school (although one of the taxpayers had earned a G.E.D.), held blue collar jobs, and had no significant investment experience. Id. at 381. Because the taxpayers were worried about their family's future and were aware they were not knowledgeable enough to make investments on their own, they relied on an investment adviser. Id. The adviser, however, led them into an investment that involved leasing energy "units" from a corporation and resulted in the loss of the entire amount of their investment, as well as the Commissioner's disallowance of the tax benefits the taxpayers had claimed in relation to the investment. Id. at 381-382. Because the Heasleys had overvalued the units, the Commissioner also imposed additions to tax under section 6659, which we upheld. Id. at 382; see also Heasley v. Commissioner, T.C. Memo. 1988-408.

On appeal, the Court of Appeals for the Fifth Circuit held that the taxpayers were not subject to the section 6659 addition to tax, reasoning that when the Commissioner totally disallows a deduction or credit, the underpayment is attributable to

claiming an improper deduction or credit rather than to a valuation overstatement. Heasley v. Commissioner, 902 F.2d at 383. To support its holding, the Court of Appeals for the Fifth Circuit in Heasley relied on Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), in which it held that a valuation overstatement did not contribute to the underpayment of taxes where the underpayment was due exclusively to the fact that the property providing the basis for the tax benefits at issue had not been placed in service in the year the benefits were claimed.

On facts similar to the facts in this case, the Court of Appeals for the Third Circuit, the court to which this case is appealable, has distinguished Heasley. In Merino v. Commissioner, 196 F.3d 147 (3d Cir. 1999), the taxpayer had invested in a tax shelter that involved the leasing of recyclers. The taxpayer was a successful engineer with a Ph.D. degree in managerial economics and experience in the petrochemical industry, who, like petitioner in this case, claimed that he was an acknowledged expert in plastics technology. Id. at 149. The taxpayer investigated the tax shelter for a friend and invested for himself as a result of his findings. Id. at 148-149. The Commissioner ultimately determined that the investment lacked economic substance, disallowed the tax benefits the taxpayer claimed in relation to the investment, and imposed additions to tax as a result of the

underpayment, including an addition for overvaluation, which we upheld.  See Merino v. Commissioner, T.C. Memo. 1997-385.  The Court of Appeals for the Third Circuit sustained our determination and held that section 6659 is properly imposed where a claimed tax benefit is disallowed because it is an integral part of a transaction lacking economic substance. Merino v. Commissioner, 196 F.3d at 159.  The Court of Appeals for the Third Circuit distinguished the Court of Appeals for the Fifth Circuit's holding in Heasley that section 6659 was inapplicable where there were no grounds for the disallowance of the taxpayers' claimed benefits other than overvaluation, "because the Court's decision appears to have been driven by understandable sympathy for the Heasleys rather than by a technical analysis of the statute."  Merino v. Commissioner, 196 F.3d at 158-159.

In arriving at its decision, the Court of Appeals for the Third Circuit relied on Gilman v. Commissioner, 933 F.2d 143, 152 (2d Cir. 1991), affg. T.C. Memo. 1989-684, in which the Court of Appeals for the Second Circuit stated:

> Where a transaction is not respected for lack of economic substance, the resulting underpayment is attributable to the implicit overvaluation.  A transaction that lacks economic substance generally reflects an arrangement in which the basis of the property was misvalued in the context of the transaction.  While this interpretation of underpayment "attributable to a valuation

overstatement" represents a less common application of section 6659, we believe it comprehends the tax return representations that Congress intended to penalize.

Merino v. Commissioner, 196 F.3d at 158-159 (quoting Gilman v. Commissioner, supra at 152).  Petitioner argues, however, that the Court of Appeals for the Third Circuit tempered its reliance on Gilman by holding that "where a claimed tax benefit is disallowed because it is an integral part of a transaction lacking economic substance, the imposition of the valuation overstatement penalty is properly imposed, absent considerations that are not present here."  Merino v. Commissioner, 196 F.3d at 159 (emphasis added).  Petitioner thus compares himself to the Heasleys and contends that those considerations "might * * * include the fact that the Heasleys were ripped off like Dr. Korchak".  We are not persuaded by petitioner's comparison.

The Court of Appeals for the Third Circuit reasoned that the Court of Appeals for the Fifth Circuit's decision in Heasley was based on "understandable sympathy" for the Heasleys and highlighted the facts that the Heasleys were blue-collar workers without a high school education who relied completely on an investment adviser out of concern for their family's future and awareness that they were not knowledgeable enough to invest on their own.  Id. at 158.  The Court of Appeals for the Third Circuit also reasoned, however, that "the Merinos [were] not the Heasleys" and that due to the significant differences between

the Heasleys and Merinos, Heasley did not provide "an analytical umbrella for the Merinos". Id. at 158. Because of petitioner's education and experience, as well as his repeated arguments that he was qualified to analyze the Madison investment and did so, petitioner is also "not the Heasleys", and section 6659 is properly imposed if petitioner's claimed tax benefits were disallowed because they were an integral part of a transaction lacking economic substance.

In this case, respondent reduced petitioner's reported basis in his investment property, the recyclers, from $577,500 to zero so that the corresponding credits he had claimed were also reduced to zero. Petitioner's basis was reduced to zero in accordance with respondent's determination at the partnership level that Madison's basis in the recyclers was zero because Madison had not incurred the benefits and burdens of ownership of the recyclers, it had not made a true economic investment in the recyclers, the liabilities to which the recyclers were subject lacked economic substance and could not be considered a cost of the equipment, and the recycler leasing activities were shams without economic substance. The underpayment in this case thus flows from respondent's determination at the partnership level that Madison did not have an economic investment in the recyclers, a determination petitioner may not challenge here. N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 745 (1987)

(the prior partnership-level proceeding will be res judicata as to partnership adjustments at an affected items proceeding).[22]

A determination of whether section 6659 may be applied to a partner upon the resolution of a partnership proceeding nevertheless may require findings of fact peculiar to the taxpayer, including that the taxpayer is an individual, a closely held corporation, or a personal service corporation and that the taxpayer's underpayment attributable to an overstatement is at least $1,000.  See N.C.F. Energy Partners v. Commissioner, supra at 746.  Petitioner, however, has failed to present any evidence that would lead us to conclude his

---

[22]Because Madison is a TEFRA partnership, the tax treatment of any partnership item is determined at the partnership level pursuant to the TEFRA provisions.  See secs. 6221 to 6233; see also Sparks v. Commissioner, 87 T.C. 1279, 1284 (1986) (the TEFRA provisions apply generally to partnerships for taxable years beginning after Sept. 3, 1982).  Under the TEFRA provisions, the tax treatment of partnership items is decided at the partnership level in a unified partnership proceeding rather than in a separate proceeding for each partner.  Boyd v. Commissioner, 101 T.C. 365, 369 (1993).  Partnership items include, for example, the partnership aggregate and each partner's share of items of income, gain, loss, deduction, or credit of the partnership, and other amounts determinable at the partnership level with respect to partnership assets, investments, transactions, and operations necessary to enable the partnership or the partners to determine the allowable investment credit.  See sec. 6231(a)(3); sec. 301.6231(a)(3)-1(a)(1)(i), (vi)(A), Proced. & Admin. Regs. Affected items, i.e., items affected by the treatment of partnership items such as certain additions to tax and interest, can only be assessed following the conclusion of the partnership proceeding.  See secs. 6225(a), 6231(a)(5); White v. Commissioner, 95 T.C. at 211; N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 745 (1987); Maxwell v. Commissioner, 87 T.C. 783, 791 n.6 (1986).

underpayment did not result from Madison's lack of economic investment in the recyclers or from Madison's overall sham nature, nor has petitioner shown that section 6659 is otherwise inapplicable.

2.   Section 6659(e)

Under section 6659(e), the Commissioner may waive all or part of the addition to tax for valuation overstatement based on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith.  The Commissioner's decision to grant or deny the waiver is discretionary and is reviewable only for an abuse of discretion, such as where the denial of the waiver is arbitrary, capricious, or unreasonable.  See Krause v. Commissioner, 99 T.C. at 179; Haught v. Commissioner, T.C. Memo. 1993-58.

Respondent contends that petitioner may not challenge the section 6659 penalty because petitioner "has not asked respondent to waive all or a portion of that addition".  In the alternative, respondent contends that petitioner failed to show that there was a reasonable basis for the valuation or adjusted basis he claimed on his return.  Petitioner contends that he first learned of respondent's imposition of the section 6659 addition to tax in the notice of deficiency and that he was unable to request a waiver through administrative channels

during the 90-day period in which he was allowed to petition the imposition of the penalty to this Court.  Petitioner further contends, however, that his case was assigned to the IRS Office of Appeals for several months before the trial and that during that time "All present issues were discussed at length and ultimately rejected by the Service", so that "the failure of the Commissioner to waive the overvaluation penalty while this case was in Appeals, amounts to an abuse of discretion".

Petitioner has failed to persuade us that he requested a waiver before trial as he alleges.  Petitioner did not request a waiver in his petition, nor did he allege that he had requested a waiver or that he had reasonable cause for the valuation of the partnership's assets claimed on his return.  Petitioner did not introduce any evidence at trial to prove that he had requested a waiver or that he submitted any information to respondent in support of a waiver.  See, e.g., Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988); Haught v. Commissioner, supra; Magnus v. Commissioner, T.C. Memo. 1990-596.  Because petitioner has failed to establish that he made a timely request for waiver, we cannot conclude that respondent abused his discretion in failing to waive the section 6659 addition to tax. Merino v. Commissioner, 196 F.3d at 159 (the Tax Court cannot order the Commissioner to affirmatively do something that is within the original discretion of the Commissioner where there

is no record evidence of an abuse of administrative discretion because "the taxpayers and their counsel * * * ought to request any such waiver, not the Tax Court"); Osowski v. Commissioner, T.C. Memo. 2000-367; Ulanoff v. Commissioner, T.C. Memo. 1999-170; Jaroff v. Commissioner, T.C. Memo. 1996-527; Haught v. Commissioner, supra.

Because petitioner's underpayment is the result of an overvaluation of more than 250 percent and because petitioner did not prove that he requested a waiver of the section 6659 addition to tax, we sustain respondent's determination that petitioner is liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed tax benefits.

## C.   Section 6621(c)

Section 6621(c) provides for an increased rate of interest on an underpayment of tax equal to 120 percent of the normal rate under section 6601, but only if such underpayment exceeds $1,000 and is attributable to a tax-motivated transaction. Section 6621(c)(3) defines the term "tax-motivated transaction" to include any valuation overstatement within the meaning of section 6659(c) and any sham or fraudulent transaction.  Sec. 6621(c)(3)(A)(i), (v).  The increased rate of interest is effective with respect to interest accruing after December 31, 1984, even if the transaction was entered into before that date.

See Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); Barlow v. Commissioner, T.C. Memo. 2000-339.

Petitioner contends that he should not be held liable for the increased interest rate under section 6621(c) because he invested in Madison with the intent to earn a profit. Respondent contends that we lack jurisdiction to determine whether petitioner is liable for the increased interest rate, citing our Opinion in White v. Commissioner, 95 T.C. 209 (1990). We agree with respondent. As explained below, we lack both affected item jurisdiction under section 6230 and section 6621(c)(4) jurisdiction to determine whether petitioner is liable for additional interest under section 6621(c). See White v. Commissioner, supra.

### 1. Affected Item Jurisdiction

An affected item is any "item to the extent such item is affected by a partnership item." Sec. 6231(a)(5). Affected items are of two types. The first type is a computational adjustment made to reflect a change in a partner's tax liability resulting from partnership-level adjustments. Sec. 6231(a)(6); N.C.F. Energy Partners v. Commissioner, 89 T.C. at 744. The Commissioner may assess a computational adjustment against a partner without issuing a notice of deficiency once the partnership proceeding is completed. Sec. 6230(a)(1); N.C.F.

Energy Partners v. Commissioner, supra at 744.  The second type requires a determination that must be made at the partner level. N.C.F. Energy Partners v. Commissioner, supra at 744.  In appropriate circumstances, once the partnership proceeding is completed, the Commissioner may issue a notice of deficiency to a partner for additional deficiencies attributable to an affected item requiring partner-level determinations.  Sec. 6230(a)(2)(A)(i); N.C.F. Energy Partners v. Commissioner, supra at 743-744.

Additional interest is an affected item that requires a partner-level determination.  White v. Commissioner, supra at 212; N.C.F. Energy Partners v. Commissioner, supra at 745. Section 6230(a)(2)(A)(i) provides that subchapter B shall apply to any deficiency attributable to affected items that require partner-level determinations.  Subchapter B of chapter 63 sets forth deficiency procedures in the case of income, estate, gift, and certain excise taxes.

Section 6213(a) of subchapter B authorizes the Tax Court to redetermine a deficiency provided a timely petition is filed. (Hereinafter subchapter B of chapter 63 will be referred to as the "deficiency procedures".)  Section 6211(a) defines "deficiency", in general, as the amount by which the tax imposed exceeds the sum of the amount of tax shown on the return and the

amount of tax previously assessed over any rebates.  White v. Commissioner, supra at 213.

In White, a case involving substantially the same procedural facts as this case,[23] we considered whether additional interest is a "deficiency" within the meaning of section 6211(a).  We held that it was not and that, therefore, we did not have jurisdiction under section 6230(a)(2)(A)(i) to redetermine additional interest.  We explained that section 6601(e)(1), which provides generally that any reference in the Code to any tax "shall be deemed also to refer to interest", excludes subchapter B of chapter 63 from that general rule.  Consequently, references to tax in the definition of deficiency contained in section 6211(a) do not include interest.  Because our affected item jurisdiction under section 6230 is limited to "a deficiency attributable to affected items which require partner level determinations" and because additional interest is not a deficiency within the meaning of section 6211(a), we

---

[23]In White v. Commissioner, 95 T.C. 209, 210 (1990), the Commissioner issued an FPAA to the tax matters partner of a partnership determining adjustments to a partnership's return. The taxpayers received a copy of the FPAA from the Commissioner as notice partners, and neither the tax matters partner nor the notice partners filed a petition disputing the FPAA.  Id. Thereafter, the Commissioner assessed the deficiency in tax resulting from the partnership adjustments against the taxpayers as a computational adjustment.  Id.  By a subsequent statutory notice of deficiency, the Commissioner determined that the taxpayers were liable for additional interest under section 6621(c), as well as additions to tax under secs. 6653(a)(1) and (2) and 6659, and the taxpayers disputed the determination.  Id.

concluded that we did not have jurisdiction under section 6230 to redetermine additional interest.  White v. Commissioner, supra at 212-214.

Petitioner is in the same procedural posture as the taxpayer in White, and our holding in White is controlling.  Our affected item jurisdiction under section 6230(a)(2)(A)(i) does not include jurisdiction to redetermine whether petitioner is liable for additional interest.  Id.

2.    Section 6621(c)(4) Jurisdiction

Section 6621(c)(4) provides that

In the case of any proceeding in the Tax Court for a redetermination of deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.

The Tax Court, therefore, has jurisdiction in a deficiency proceeding to determine the portion of such deficiency that is a substantial underpayment attributable to tax-motivated transactions.  The language "such deficiency" refers to the deficiency that the Court is redetermining.  White v. Commissioner, supra at 216.

In White, we also decided whether section 6621(c)(4) gave us jurisdiction to redetermine the taxpayer's liability for additional interest.  We held that it did not.  Section 6621(c)(2) provides that a "substantial underpayment attributable to tax motivated transactions" means any

underpayment of taxes imposed by subtitle A for any taxable year that is attributable to one or more tax-motivated transactions if the amount exceeds $1,000. We concluded in White that no part of the deficiency fit within the definition of a substantial underpayment attributable to tax-motivated transactions contained in section 6621(c). An underpayment within the meaning of section 6621(c)(2) is an underpayment of tax imposed by subtitle A. The only deficiencies in tax at issue in White[24] were deficiencies resulting from additions to tax that are imposed by subtitle F.

In this case, the only items at issue other than additional interest are additions to tax, and the additions to tax are imposed by subtitle F, not subtitle A. No portion of the deficiency involves an underpayment of tax imposed by subtitle A. Because no portion of the deficiency before the Court is attributable to tax imposed by subtitle A, no portion of the deficiency before the Court can be a substantial underpayment attributable to tax-motivated transactions. White v. Commissioner, 95 T.C. at 216. Consequently, we also lack

---

[24]Sec. 6662(a)(2) provides that "Any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter." Although sec. 6662(b) provides that sec. 6662(a) shall not apply to certain additions to tax, we concluded in White v. Commissioner, 95 T.C. at 215, that the additions to tax imposed under secs. 6653(a)(1) and (2), and 6659, which were at issue therein, were taxes for purposes of the deficiency procedures under sec. 6662(a)(2).

jurisdiction under section 6621(c)(4) to redetermine additional interest.[25]

D.   Conclusion

We have carefully considered all remaining arguments by the parties for results contrary to those expressed herein and, to the extent not discussed above, conclude that those arguments are without merit.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[25]If petitioner had paid some or all of the additional interest that was determined by respondent under sec. 6621, petitioner would have had the opportunity to contest his liability for such interest pursuant to the Court's overpayment jurisdiction.  See sec. 6512(b); Barton v. Commissioner, 97 T.C. 548 (1991); Barlow v. Commissioner, T.C. Memo. 2000-339. Petitioner does not contend that he paid any of the additional interest.